[Civil No. 4705.   Filed June 5, 1944.]

[149 Pac. (2d)  360.]

STATE OF ARIZONA, SIDNEY P. OSBORN, as Governor of the State of Arizona; DAN E. GARVEY, as Secretary of the State of Arizona; JIM BRUSH, as Treasurer of the State of Arizona; JOE CONWAY, as Attorney General of the State of Arizona; ANA FROHMILLER, as Auditor of the State of Arizona; and O. C. WILLIAMS, as Land Commissioner of the State of Arizona, Appellants, v. W. C. DAVENPORT, Appellee.

Mr. Joe Conway, Attorney General and Mr. Thomas J. Croaff, Assistant Attorney General, for Appellants.

Mr. Blaine B. Shimmel, for Appellee.

ROSS, J.—The question for decision is what officer or agency of the state has authority to sell and convey lands acquired by the state through foreclosure of its mortgage liens. While such heretofore has been exercised by the governor, secretary of state and state treasurer, the title companies and others have recently questioned the correctness and legality of such conveyances, and to have such question settled and determined plaintiff Davenport has instituted this proceeding.

Those who dispute the right of the governor, secretary of state and state treasurer to deed such property to purchasers insist that the proper person or authority to make such conveyance is the state land department, acting by and through the state land commissioner.

The state was the owner of the northeast quarter of the northeast quarter, section 12, township 2 north, range 1 east, Gila and Salt River Base and Meridian, Maricopa County, having acquired it through fore-

closure of a mortgage given as security for a loan from the state permanent school fund. The appellee Davenport on October 27, 1941, at a public sale of such land by the state, bid for it the sum of $6,600 cash, and such being the highest and best bid received, it was accepted by the state, and in due course the governor, secretary of state and state treasurer deeded it to appellee.

This proceeding is in the nature of an action to quiet title, and it also seeks a declaratory judgment establishing plaintiff's title to the premises. The trial court gave judgment in favor of plaintiff, from which the state has appealed, and in support of the appeal contends that the judgment should have been in its favor.

■ The state's right and power to sell the land is not in question; the validity of all the proceedings in connection with the disposition of the state's title is admitted. The only question for decision is who, under the law, had the power and right to make the sale and execute the deed of the premises to the plaintiff, the governor, secretary and treasurer, or the state land commissioner.

The Act admitting Arizona to statehood grants to the state, in addition to grants theretofore made to the territory, large areas of institutional and public school lands. It was not until 1915 that the state legislature passed legislation (second special session, chapter 5) providing for the disposition of such lands. The title of such act is a fair index to its contents, and so far as here material is as follows: "An act to provide a code for the systematic administration, care and protection of the state lands and vesting the necessary powers therefor in a department, to be known as the State Land Department, and creating the office of Commissioner of State Lands to carry out the provisions hereof; . . . to pro-

vide for the establishment of special funds for the several purposes for which lands were granted to the State of Arizona by the Enabling Act or otherwise; and for the disposition of the receipts of such lands; . . . ."

The Act provides for a state land department, consisting of the governor, secretary of state, treasurer, attorney general and the auditor, and authorizes this body to appoint a state land commissioner who, under the direction of the department, is given charge and control of all lands owned by the state (with exceptions immaterial here), with full power to administer the same in accordance with the terms of the Act. In Section 68 of the Act it is provided, " . . . the commissioner shall issue to the purchaser a patent therefor . . . signed by the Governor and countersigned by the Secretary of State."

The evident intent of the legislature, as here expressed, is that when the title conveyed is directly from the sovereignty it shall be executed by the commissioner who makes the sale, along with the governor and secretary of state. Such provision, therefore, has doubtful application to a situation like the present one, since Davenport derives his title through an execution sale issued upon a judgment of foreclosure. The mortgage foreclosed was for money loaned by the state out of the permanent school fund.

The state's rights in such case under the law (sections 113 and 114, chapter 5, Laws of 1915, second special session, as amended by chapter 94, Laws of 1929) are defined as follows:

"Section 1. . . . Such mortgages shall be governed by the laws of the state and may be foreclosed in the name of the state as other real property foreclosures; when it appears to be to the best interest of the state, the state representatives shall bid the property in for the amount of the financial interest of the state.

Whenever such lands shall become the property of the state through such foreclosure such lands shall be administered by the Governor, Secretary of State and Treasurer (state loan board). . . .

"The State Treasurer, by and with consent and approval of the Governor and Secretary of State, may sell any mortgage coming under the provisions of this act, . . . .

"Section 2. The Treasurer with the consent and approval of the Governor and Secretary of State may extend or renew any loan for a period not longer than the term of the original loan provided all interest, taxes, water or other charges are paid at the date of such renewal."

This change in the agency to sell and convey the land was made, no doubt, to harmonize and conform with section 7, article 10 of the state constitution, reading:

"A separate fund shall be established for each of the several objects for which the said grants are made and confirmed by the said Enabling Act to the state, and whenever any moneys shall be in any manner derived from any of said lands, the same shall be deposited by the state treasurer in the fund corresponding to the grant under which the particular land producing such moneys was, by said Enabling Act, conveyed or confirmed. No moneys shall ever be taken from one fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed. The state treasurer shall keep all such moneys invested in safe, interest-bearing securities, which securities shall be *approved by the governor and secretary of state,* and shall at all times be under a good and sufficient bond or bonds conditioned for the faithful performance of his duties in regard thereto." (Italics ours.) See, also, section 28, Enabling Act.

It was doubtless the intention that the investment of institutional funds or school moneys should be made by the state treasurer, with the approval of the

governor and secretary of state, and the same agents, by chapter 94, *supra,* were selected to foreclose the security and take title when the state was the purchaser. Chapter 94 had not been changed nor repealed at the time this cause of action arose. The legislative expression, contained in chapter 86, Regular Session, 1939, confirms this agency.

Chapter 86, Regular Session 1939, provides that the state treasurer, with the consent of the governor and secretary of state, shall have power to grant an extension of loans of the permanent school fund of the state, secured by mortgage on farm lands. It also provides that the treasurer, with the consent of the governor and secretary of state, may assign any note or mortgage on farm lands, and that the treasurer may foreclose any such mortgage, carrying forward the administrative authority of these officers.

The provisions of chapter 86, while not stating in so many words that the state treasurer, governor and secretary of state shall execute conveyances to purchasers of land acquired through foreclosure by the state for money loaned from the school funds, indicates pretty clearly that intent.

The attorney general calls our attention to the provision of Section 11–102, Arizona Code Annotated 1939 (the same as sections 2 and 3 of chapter 5, Laws of 1915), to the effect that "The department may sell and lease all lands owned or held in trust by the state as hereafter provided, . . . ." But, as we have shown, chapter 94, passed in 1929, placed the power to sell or foreclose lands for school money loaned in the hands of the governor, secretary of state and the state treasurer, and this being the last expression of the legislature will prevail over previous ones in conflict with it.

As we have heretofore stated, the power to administer school funds loaned upon real estate security is

clearly, by chapter 94, *supra,* vested in the treasurer, governor and secretary of state, and any provisions in chapter 5 of the Laws of 1915 in conflict with chapter 94 necessarily were repealed by the later act. Notwithstanding, the attorney general in his brief to sustain his contention that the land should have been administered by the land commissioner, relies solely upon the provisions of chapter 5. His contentions might be tenable if chapter 5 was the last expression of the legislature's will.

█ While the construction of the statutes by the administrative officers is not binding upon the courts, we should not adopt a different construction unless impelled to do so by the text of the law, especially where it would disturb and destroy the rights of the citizen who, in good faith, relied upon and believed in the right of such officers to do what they represented themselves empowered, under the law, to do.

█ The record shows that the state's legal adviser (its attorney general) participated in the proceedings that finally culminated in issuing a deed to Davenport. We are informed that Davenport was not the only person who has bought land from the state, under the same circumstances. We, therefore, feel that if we were in doubt as to how the case should be decided, we should resolve that doubt against the contentions of the state.

In the recent case of *Conway* v. *Mosher, et al.,* 55 Ariz. 467, 103 Pac. (2d) 465, 466, we said:

" . . . Where a uniform construction of a statute has been given by the administrative officers of the state whose duty it has been to construe and enforce it, we do not feel that we should disregard their construction, especially if to do so would likely upset many tax sales and destroy many tax titles of persons

who relied upon such construction, even if we entertain some doubts of the correctness of their actions."

For the reasons herein stated, the judgment is affirmed.

McALISTER, C. J., and STANFORD, J., concur.