223 P.2d 915

HAGGARD et al. v. INDUSTRIAL COMMISSION et al.

No. 5263.

Supreme Court of Arizona.

Nov. 3, 1950.

Leslie C. Hardy, of Phoenix, for appellants and cross-appellees.

H. S. McCluskey, Phoenix, Robert E. Yount and Donald J. Morgan, Phoenix, of counsel, for Industrial Commission of Arizona, appellees and cross-appellants.

LA PRADE, Chief Justice.

Appellants (plaintiffs below) brought an action in behalf of themselves and others similarly situated (class action under the provisions of Sec. 21-524, Arizona Code Annotated, 1939, challenging certain orders of the Arizona Industrial Commission decreeing that certain individuals in and around plaintiffs' places of business were employees of plaintiffs and insurable as such under the provisions of the Workmen's Compensation Act, A.C.A.1939, § 56-901 et seq., at the expense of plaintiffs. From an adverse judgment they prosecute this appeal.

The factual situation out of which the action arose is not in dispute and may be summarized as follows: At the time it was instituted the appellants Haggard et al. were engaged in conducting horse racing in Arizona; the appellants Hagin et al. in dog racing. These businesses were regularly licensed under the provisions of Ch. 73, A.C.A.1939, Secs. 73-1601 to 73-1608, but now controlled by Ch. 61, Reg. Sess. 1949, as amended by Ch. 56, Laws 1949, 1st Spec. Sess. The new law, however, does not alter the situation and the questions presented by this action. Permits to conduct racing meets under these new provisions were duly issued to plaintiffs and they conducted racing meets under and by virtue of said permits. Since plaintiffs were subject to the provisions of the Workmen's Compensation Act, they took out compensation insurance policies with the commission.

In January, 1949, the commission became doubtful as to whether these policies conformed with the law, and therefore on January 20, 1949, ordered that all such policies would be cancelled as of January 25, 1949.

The order further provided that if plaintiffs would institute an appropriate action to determine the questions involved, the commission would issue binders according full insurance protection to plaintiffs, subject to a judicial determination of the questions in dispute. Plaintiffs thereupon applied to the commission for a rehearing on the order under Sec. 56-908, A.C.A.1939, and also made application for an insurance policy which limited the coverage to "the office force, the pari-mutuel machines, ground keepers, janitors, and persons directly on our (plaintiffs') payroll," and expressly excluded all "trainers, stablemen, helpers, swipes, grooms, exercise boys, hostlers, jockeys, horse owners," it being the contention of plaintiffs that the parties excluded in the application were, so far at least as plaintiffs were concerned, independent contractors and so not proper subjects of industrial insurance by plaintiffs.

At the hearing the commission declined to issue the policies of insurance as applied for, and confirmed its order of cancellation of existing policies, but offered to issue a binder affording insurance on all persons serving in any capacity in the racing meet operated by plaintiffs on certain conditions, the substance of which was that plaintiffs

(a) Would immediately institute a suit of proper nature to determine the questions in dispute,

(b) Would furnish full information as to all persons whose right of coverage by policies issued by the commission to plaintiffs was in dispute, and further required and ordered: "That any person or persons purporting to be independent contractors for whom any claim of exemption from coverage under this policy is made shall be disclosed to the Commission prior to any such persons being put to work; and the applicant agrees, as a consideration and inducement for the issuance of this policy, that all such contractors purporting to be independent contractors who do not have a policy of insurance under the Workmen's Compensation Law, and who are subject thereto, and the employees of such contractors, shall be deemed to be insured under this policy and premium to be paid thereon."

(c) Would accept and pay as a proper premium for all such persons the sum computed in the method and in the amount fixed by the comission, all subject finally to the decision of this court on the questions in dispute.

The commission declared "* * * that there is no established formula by which the Commission may determine what constitutes the fair average earning capacity of the persons engaged in the industry for any thirty-day period; * * *" and insisted upon the establishment of a formula which would take into consideration the intermittency of the employment and the difficulty in determining what constitutes a fair average earning capacity of the persons engaged in the industry. This formula was to be agreed to by the commission, the insured, and their employees, and was to constitute the basis for the payment of compensation benefits and for the assessment of premiums.

The plaintiffs agreed to said conditions under protest, and the commission suspended the cancellation of the insurance policies above set forth and issued a binder covering all the occupations as above, whereupon this suit was promptly filed and submitted to the trial court on the issues raised by the pleadings and the record made before the Industrial Commission. The trial judge announced that the case was not to be tried de novo, "but purely a matter of review for the court to determine the action of Commission relative to whether the Commission acted reasonably and lawfully in its order." Nevertheless that court made findings of fact and conclusions of law and rendered its judgment thereon, whereupon each party appealed to this

court from that portion of the judgment unfavorable to their respective contentions.

The record shows that neither party questions the sufficiency of the evidence before the commission and before the court by acquiescence to sustain the findings of fact made by the trial court, *insofar as such findings are in truth findings of fact and not conclusions of law,* as we shall hereafter point out.

Our opinion in O'Neill v. Martori, 69 Ariz. 270, 212 P.2d 994, had not been handed down when this case was determined below or at the time of the filing of briefs herein. At the time of the oral presentation of arguments in this court the holding in the Martori case was called to the attention of counsel and it was then mutually conceded that regardless of the misconception of the trial procedure it was desired that the case be determined on the record made as though the matter had been tried de novo within the precepts of the Martori case. It is only the conclusions of law which the trial court drew from the findings of fact which are in dispute, and it is to these conclusions of law that we shall later direct our attention.

We shall consider the case on the legal issues raised by the record rather than on the formal assignments of error, and first review the issues raised by the appeal of plaintiffs.

The first issue is whether plaintiffs were entitled to a declaratory judgment; the second is whether the commission had the power to fix premium rates on the basis it used; and the third is whether certain classes of persons rendering services in connection with the racing meet were employees of plaintiffs within the meaning of the Workmen's Compensation Act.

The first question is whether the Declaratory Judgement Act, being Art. 7, Ch. 27, A.C.A.1939, is applicable to proceedings of this nature, or whether the only remedy of plaintiffs is the special procedure set forth in Secs. 56-914 to 56-918, A.C.A.1939.

A similar question has been raised in other jurisdictions and the majority of cases hold that under a special act like the Workmen's Compensation Act the exclusive remedy is that set forth in the act, and that the Declaratory Judgment Act is not applicable. Moore v. Louisville Hydro-Elec. Co., 226 Ky. 20, 10 S.W.2d 466; United States Fidelity & Guaranty Co. v. Thirion, 123 N.J.L. 29, 7 A.2d 863; State ex rel. and to use of Public Service Commission v. Blair, 347 Mo. 220, 146 S.W.2d 865; State ex rel. and to use of Public Service Commission v. Padberg, 346 Mo. 1133, 145 S.W. 2d 150.

We think the question has already been settled for Arizona in S. H. Kress & Co. v. Superior Court, 66 Ariz. 67, 182 P.2d 931, 933, where this court quoted approvingly from Employers' Liability Assur. Corp. v. Matlock, 151 Kan. 293, 98 P.2d 456, 127 A. L.R. 461, the following language: "This

court has repeatedly asserted the well established principle that the workmen's compensation act establishes a procedure of its own, and that the procedure furnishes a remedy which is substantial, complete and exclusive in compensation cases. (Citing cases.)"

This action was brought to set aside an order of the commission, and the procedure to attack such orders is set forth in Secs. 56-914 to 56-918 of the act, as interpreted in O'Neill v. Martori, supra.

■ The trial court did not err in refusing to render judgment under the Declaratory Judgment Act.

By the second question raised appellants challenge the constitutionality of the sections of the act obligating employers to pay premiums and the commission to collect them. It is thus seen that if this challenge is good the entire Workmen's Compensation Act is destroyed. The specific contention is that there is no standard prescribed by law upon which the Industrial Commission can fix rates or premiums for insurance in the compensation fund upon persons employed about race tracks, or in fact any employees. The commission in the matter of fixing rates or premiums for insurance has considered as a factor the total payroll and number of employees in each class of employment. The objection to the use of any such basis is founded upon two grounds:

(a) That the compensation act forbids the use of such a basis.

(b) That if the act be held to permit the commission to use such a basis it is an unlawful and unconstitutional delegation of legislative power.

Originally, the authority of the commission to issue contracts of insurance was based on Sections 32, 34, and 35 of Ch. 83 of the Act of 1925, which read so far as material as follows:

"Section 34. Contracts as to Insurance. —The commission may, in its official name, make contracts of insurance as *herein provided,* and such other contracts relating to the state compensation fund as are authorized or permitted under the provisions of this act. Such contracts of insurance may include and cover the entire underlying liability of employers insured in the state compensation fund so that such employers may be fully protected, not only for all compensation claims, but for all liability claims whatsoever by employees or the dependents or heirs of killed employees, including the cost of defense in the event of suit. (Emp. sup.)

"Section 35. Policy of Insurance. Payment of Premiums.—1. Every employer insuring in the state compensation fund shall receive from the commission a contract or policy of insurance in a form to be approved by the state commission. * * *"

"Section 32. * * * The commission shall determine the hazards of the different classes, and fix the rates of premium therefor, *based upon the total payroll*

*and number of employees in each of such classes of employment,* at the lowest possible rate consistent with the maintenance of a solvent state compensation fund and the creation of a surplus and reserve; and for such purpose may adopt a system of schedule rating in such a manner as to take account of the peculiar hazard of such individual risk. * * * " (Emp. sup.)

This court in Industrial Commission of Ariz. v. Arizona Power Co., 37 Ariz. 425, 295 P. 305, 310, had before it the question of the nature of insurance policies authorized by the then existing law and the authority of the commission to issue policies. It said: " * * * The commission is an agency of the state, created and maintained for the purpose of administering certain of the state's sovereign powers, and must proceed and act according to legislative authority as expressed or necessarily implied. Where the legislature has provided the terms and conditions of insurance policies the commission may issue, it seems to us very doubtful if any other kind may be legally issued by the commission. * * *"

The court held that under the then existing provisions of the law the commission was without authority to issue a self-rating policy of insurance.

The legislature in 1939 substituted for these provisions Secs. 56-921, 56-922, and 56-923, A.C.A.1939, and in determining the manner of fixing rates said as follows: "56-923. *Manner of fixing rates.*—The state compensation fund and accident bene-fit fund, hereinafter provided for, shall be neither more nor less than self-supporting. Employments affected by the provisions hereof shall be divided by the commission for the purpose of the state compensation fund into classes whose rates may be readjusted at such times as the commission may determine. The commission may rearrange the classes by withdrawing any employment embraced in one class and transferring it wholly or in part to another class. Separate accounts shall be kept of the amounts collected and expended in each class for determining rates, but for paying compensation and dividends the fund shall be one and indivisible. The commission shall determine the hazards of the different classes of occupations or industries, and fix the rates of premium therefor at the lowest rate consistent with the maintenance of a solvent state compensation fund, and the creation of a surplus and reserves, and for such purpose may adopt a system of schedule rating in such a manner as to take account of the peculiar hazard of each individual risk. * * *"

This is similar in substance though not in form to Sec. 32 of the Act of 1925, except that it does not contain the phrase, "based upon the total payroll and number of employees in each of such classes of employment".

It is the contention of plaintiffs that the legislature by deleting this language took away from the commission the power to consider the payroll and number of em-

ployees as the basis of premium rates, and left no standard of any kind *prescribed by law* upon which the Industrial Commission can fix rates or premiums for insurance in the compensation fund.

We think, on the contrary, that, after the decision in the Power Company case which held that because of the language in the original act it was mandatory upon the commission to use such a basis for premium rates, the changed language in regard to contracts of insurance and rates above set forth, instead of being intended by the legislature as a further *limitation* upon the powers of the commission, was rather an *extension* of these powers and making available other factors for consideration in addition to payrolls and number of employees in fixing insurance rates. In most cases wages paid are determinative of the "average monthly wage," but not always and certainly not conclusive in all cases. Steward v. Industrial Commission, 69 Ariz. 159, 211 P.2d 217. This is the construction placed on the act by the commission for the last ten years without change by the legislature, and while this is not conclusive, it is persuasive that such construction is correct. State v. Davenport, 61 Ariz. 355, 149 P.2d 360. We think the commission had the right under the present law to use, at its option, the total payroll and number of employees as one of the bases for fixing insurance rates.

We consider next the question as to whether or not Sec. 56-923 is unconstitu-tional as being an unlawful delegation of legislative power to the commission.

Plaintiffs in the present action seek to compel the commission to exercise its power of issuing compensation insurance, and at the same time contend the basis upon which the commission has fixed the premium for such insurance is unconstitutional. It is the general rule, well established in Arizona, that a litigant may not claim affirmative relief under an act of the legislature and at the same time contend a relative portion of the act under which the relief is claimed is unconstitutional. Ison v. Western Vegetable Distributors, 48 Ariz. 104, 59 P.2d 649. We might well decline to consider the constitutional question.

But, assuming that this rule does not apply in the present case, we think the delegation of power by the legislature to the commission in Sec. 56-923, supra, is not unconstitutional. The ordinary rule, of course, is that legislative powers cannot be delegated to administrative bodies. Loftus v. Russell, 69 Ariz. 245, 212 P.2d 91; Tillotson v. Frohmiller, 34 Ariz. 394, 271 P. 867; Crane v. Frohmiller, 45 Ariz. 490, 45 P.2d 955. But this does not mean that when authorized to do so by the act itself administrative bodies may not make rules and regulations *supplementing* legislation for its complete operation and enforcement, *if such rules and regulations are within the standards set forth in the act of the legislature.* Tillotson v. Frohmiller, supra.

■ The extent and character of these rules and regulations must be fixed in accordance with common sense and the inherent necessities of governmental coordination, and the standards laid down by the legislature and within which the administrative body may act may be in broad and general terms. J. W. Hampton, Jr., and Co. v. U. S., 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624.

■ The Industrial Commission is expressly by the act given the power to issue insurance policies and to fix rates for premiums to be paid. Secs. 56-921, 56-923, supra. This is not a delegation of legislative power, but is merely a vesting of power in the administrative body to carry out the purpose of the act. Scranton Leasing Co. v. Industrial Commission, 51 Utah 368, 170 P. 976. Of course, the rates and regulations adopted and the policies issued thereunder by the Industrial Commission must not violate any of the standards and limitations set forth in the act. Industrial Commission v. Ariz. Power Co., supra. What then are the standards required by the act? In substance, they may be stated as follows:

(a) The rates fixed shall be such as to make the fund neither more nor less than self supporting.

(b) The employments affected shall be divided into classes for determining rates.

(c) These classes may be changed from time to time.

(d) The rates shall be fixed on the basis of the hazards of the employment and the peculiar hazards of each individual risk at the lowest figure consistent with the maintenance of a solvent compensation fund.

■ Obviously, the legislature could not well fix definitely the particular rates to be used in each individual class and especially in view of the fact that these hazards change from time to time. Such fixing is peculiarly a matter for the delegation of power to an administrative body. Scranton Leasing Co. v. Industrial Commission, supra. And we think the general standards above set up which fix the purpose of the insurance, the amount of the fund required, and that in fixing the premium, the particular hazards of the risk shall be considered, create a sufficient general standard so that the rates of premium fixed thereunder by the commission are based on constitutional rules and regulations. Any other conclusion would make the operation of the act impossible.

Plaintiffs suggest many situations under which the commission might make an unjust classification and rate, overlooking the fact that any classification or rate fixed by the commission is subject to review under the act by the courts for being either unreasonable or unlawful. We hold that the act sets up sufficient standards for the commission to follow in fixing regulations and rules governing rates for premiums of insurance, and is therefore constitutional.

It is appropriate at this time to consider the conditions and reservations insisted upon by the commission before a policy would be issued. In the case of Gene Autry Productions v. Industrial Commission, 67 Ariz. 290, 195 P.2d 143, we thoroughly considered conditions and reservations insisted upon by the commission before issuing a policy to one engaged in making motion pictures. The reservations in that case were not dissimilar to those in the instant case. There the commission had before it the matter of establishing a rational basis of "average monthly earning capacity" in intermittent and spot risk employments where the average daily wages for short periods of time were out of line and not in harmony with the individual's average monthly earning capacity in similar employments when regularly employed. In the Autry case for the reasons therein set forth we approved the right of the commission to adopt rules and regulations relative to such employment in order to insure the solvency of the state compensation fund. We pointed out that in the last line of Sec. 56-920, A.C.A.1939, it is provided that " * * * The commission shall have full authority over the fund, and may do all things necessary or convenient in the administration thereof, or in connection with the compensation business to be carried on by it hereunder, and shall adopt rules and regulations for the collection, maintenance and disbursement of the fund."

This sentence and the entire act recognizes that the Industrial Commission is in the compensation business. This insurance business and the compensation fund cannot be maintained in a state of solvency unless premiums assessed and collected are sufficient to meet the payment of compensation benefits and all other charges and expenses authorized by law against the fund.

We also approve of the condition insisted upon by the commission that the insured should disclose to the commission the names of the persons with whom the insured purports to have independent contracts, and that this information should be disclosed prior to the initiation of any work by such independent contractors. This rule or regulation is neither arbitrary nor unreasonable, but rather in fact is dictated by sound business policy. By enforcing such a rule the commission will be able to ascertain from the designated independent contractors whether they are such in fact. This information obtained before any claim for compensation benefits is made will enable the commission to thwart any shifting of liability if such is attempted.

We think the second part of the order which compelled the applicant as a consideration and inducement for the issuance of the policy to agree "that all such contractors purporting to be independent contractors who do not have a policy of insurance under the Workmen's Compensa-

tion Law, and who are subject thereto, and the employees of such contractors, shall be deemed to be insured under this policy and premiums to be paid thereon" is unwarranted and illegal. It is arbitrary and unreasonable in that its full import is that independent contractors who happen to be without insurance and their employees are in fact employees of the original contractor or insured. It makes the determination of the fact of whether a person is an independent contractor depend upon whether he carries compensation insurance, and ignores completely the well recognized tests in the determination of that question which are set up in the act itself. Sec. 56-928(c). Its effect would be to make every insured employer police all of his independent contractors, and at his peril assume their burdens and liabilities for premiums and any judgments that might be lodged against them under the provisions of the act.

We come finally to the question as to whether the various classes of persons whom plaintiffs desire excluded from coverage in the insurance policies they requested the commission to issue are such as the plaintiffs are obliged under the act to provide insurance for. If they are, the commission is justified and indeed required to cover them by any policies of insurance which it issues to their employers, and to collect a proper premium therefor. West Chandler Farms Co. v. Industrial Commission, 64 Ariz. 383, 173 P.2d 84. These various classes are described by plaintiffs in their complaint as follows: "(a) Owners of racing horses and racing dogs; (b) trainers of racing horses and racing dogs; (c) persons employed by owners and trainers of racing horses and racing dogs in and about the stables and the racing plants where racing horses and racing dogs are quartered, trained and raced, customarily designated as stablemen, helpers, swipes, grooms, guineas, exercise boys and hostlers; (d) jockeys who ride racing horses and who exercise racing horses, and drivers who drive and exercise standardbred horses; (e) the race track veterinarian; (f) operators and owners of racing starting gates, including employees of such operators and owners; (g) photographers who make and develop photographs of the finish of horse and dog races; (h) persons employed and compensated by the owners or operators of pari-mutuel machines; (i) concessionaires or persons who enter into contracts with operators of racing tracks for the privilege of selling and vending foods and refreshments upon the racing plant; (j) persons who sell racing programs, racing forms and other racing information upon or about racing plants; (k) and persons who enter into contracts with the operators for the privilege of parking vehicles upon parking areas and their employees."

The court made additional findings of fact with reference to classes of employees other than those immediately referred to

above and which we will designate as (*l*), (m), and (n). Class (*l*) refers to sellers of wagering tickets and (m) refers to cashiers or those who cash winning tickets. No complaint was made of the fact that they were both found to be employees of appellants and compensated by them. Those in Class (n) were some of the concessionaires. In this connection the court found that some of them in consideration of their concessions or contracts paid the operator a percentage of the gross or net receipts derived from their operation. The court found with reference to concessionaires that if they paid a specified sum for their concession they were not employees of the appellants, but on the other hand that if they paid a part of their gross or net income to the appellant licensees such fact constituted them subject to the supervision and control of appellants and thereby made them employees of appellants. This distinction though it might be material from a dollar and cents viewpoint is without legal distinction under our cases and the analyses made therein in determining the relationship of employer and employee. To make this distinction determinative of the relationship would constitute every landlord leasing upon a percentage basis the employer of the lessee's employees.

Sec. 56-928, A.C.A.1939, as amended by Laws 1945, Ch. 33, sets forth who are employers and for whom they must secure compensation under the act. This section reads so far as material as follows:

"* * * 3. every person who has in his employ three or more workmen or operatives regularly employed in the same business or establishment, under contract of hire, except agricultural workers not employed in the use of machinery, and domestic servants; but exempted employers of agricultural workers or domestic servants, or employers of less than three workmen or operatives, may come under the provisions of this article by complying with its provisions and the rules and regulations of the commission. For the purposes of this section 'regularly employed' includes all employments, whether continuous throughout the year, or for only a portion of the year, in the usual trade, business, profession, or occupation of an employer.

"(b) When an employer procures work to be done for him by a contractor over whose work he retains supervision or control, and such work is a part or process in the trade or business of the employer, then such contractors and the persons employed by him, and his sub-contractor, and persons employed by the sub-contractor, are within the meaning of this section, employees of the original employer.

"(c) A person engaged in work for another, and who while so engaged is independent of the employer in the execution of the work, not subject to the rule or control of the person for whom the work is done, but is engaged only in the performance of a definite job, or piece of work, and subordinate to the employer only in ef-

fecting a result in accordance with the employer's design, is an independent contractor, and an employer within the meaning of this section."

It will be seen upon examining this section that there are two classes of persons for whom an employer must secure compensation. The first comprises those *directly* employed and compensated by the employer and consists of "workmen or operatives regularly employed in the same business or establishment, under contract of hire," with certain exceptions not material to this case. The second is where an employer procures work to be done for him by a contractor over whose work he retains supervision or control and such work is a part or process in the trade or business of the employer. Then such contractor and persons employed by him and his subcontractor and persons employed by the subcontractor are, within the meaning of this section, employees of the original employer. On the other hand, the section provides that one who is "independent of the employer in the execution of the work * * * and subordinate to the employer only in effecting a result in accordance with the employer's design" is an independent contractor and neither the latter nor his employees on the job are the responsibility of the original employer so far as the act is concerned.

Plaintiffs are engaged in the operation of race meets, and it is obvious that each and all of the persons in question perform services which are either absolutely necessary or at the least convenient and reasonable for the proper operation of such a meet. They are all, therefore, within the provision that their work is a part or process in the trade or business of the plaintiffs. But were they subject to the supervision and control of plaintiffs in the method and manner in which they performed their work, or were they really "engaged only in the performance of a definite job or piece of work, and subordinate to the employer only in effecting a result in accordance with the employer's design"?

This court has frequently held that the best single test to determine whether one is an employer or employee or independent contractor is whether the employer retains supervision or control of the work. Grabe v. Industrial Comm., 38 Ariz. 322, 299 P. 1031; Fox West Coast Theatres, Inc. v. Industrial Comm., 39 Ariz. 442, 7 P.2d 582; United States Fidelity & Guaranty Co. v. Industrial Comm., 42 Ariz. 422, 26 P.2d 1012; Southwest Lumber Mills, Inc. v. Industrial Comm., 60 Ariz. 199, 134 P.2d 162; Industrial Comm. v. Navajo County, 64 Ariz. 172, 167 P.2d 113; Industrial Comm. v. Meddock, 65 Ariz. 324, 180 P.2d 580.

Let us then turn to the findings of the trial court to see whether the various classes of persons in dispute are those for whom plaintiff must provide compensation.

We first consider the findings of the trial court and their effect, except as to Finding 42, which will be considered separately later. These findings set up in careful detail the work performed by the persons in each of the questioned classes from the beginning to the end and how and by whom they are employed and how compensated. As to classes (b) trainers, (c) employees of owners of horses and dogs, (d) jockeys, (f) owners and operators of racing gates, and (h) employees of mutuel owners or operators, they are found to be employed and paid by persons other than plaintiffs, and there is no finding or intimation that anyone exercised any supervision or control over their activities either directly or indirectly other than their immediate employer, except as set forth in Findings 33, 36, and 37 herein. Class (a) consists of owners of horses, who certainly are independent contractors, except perhaps as they are also members of Class (d), jockeys or drivers.

In Finding 33, it is expressly found that at certain times "the horses and the jockeys who ride said horses, and the dogs, are under the control of the starter and the judges and steward of the race"; and in Finding 36, "That after the completion of the race, and while the horses and dogs are on the track, the judges and steward may disqualify a horse or dog, or may disqualify a jockey who has ridden a horse, or the driver who has driven a horse * * *"; while Finding 37 is that after the completion of a race, "the judges and steward * * * may disqualify the owner or trainer of a horse, or the jockey who has ridden the horse, or the driver who has driven a horse, or any person who handles a horse, for the violation of any rule of racing * * * and said owner, or trainer, or jockeys, or drivers, or handlers * * * may be penalized * * * as may be determined by the judges and steward of the racing meet * * *."

So far as these findings are concerned, the control set forth therein is exercised by the "starter, judges and steward." While these latter are hired and paid by plaintiffs, it is obvious the nature of their work is such that it would violate every principle of reason and justice to hold that plaintiffs through them do or can exercise any control over the manner or method in which Classes (a), (b), (c), (d), (f), and (h) perform their duties. We think Findings 33, 36, and 37 are not sufficient to establish the control required to make plaintiffs the employers of these classes.

Classes (e), veterinarians, and (g), photographers, are employed and paid by plaintiffs, but it is contended the nature of their duties makes them independent contractors. The ordinary rule is that physicians and surgeons perform services of such a nature that they must be independent of control in the manner and method of performing such services, and so are independent contractors and not employees of the one for whom such services are per-

formed. Moody v. Industrial Acc. Comm., 204 Cal. 668, 269 P. 542, and cases cited therein. We think that a veterinarian is subject to the same rule. The commission claims the case of Industrial Comm. v. Navajo County, supra, holds that physicians and surgeons are employees and not independent contractors. We think that case inapplicable to the present one. Therein the court expressly limited its holding to *public* employment where the services are in behalf of the sovereign *in the exercise of its police powers,* and distinguishes cases where a private employer may make an independent contract, such as the present one.

 Class (g), photographers, were held by the court to be employees of plaintiffs. The finding followed the identical language of the complaint, which is as follows: "That a photographer is employed to make photographs of the finish of each race in order that the judges and stewards, in close races, may accurately select the horses and dogs that finish first, second, third and fourth. Said photographer is skilled in the art of making photographs of the finish of horse and dog races and the photographer is compensated by the operator of the racing track, and in connection with said services the photographer supplies and compensates all employees and supplies and pays for all equipment necessary in the taking and developing of said photographs."

The answer alleged that the photographers were contractors under the right of supervision and control of the respective plaintiffs within the definition of Sec. 56-928(a) and (b), A.C.A.1939, as amended. Photographers have been held to be artists rather than artisans. Story v. Walker, 79 Tenn. 515, 11 Lea 515, 517, 47 Am.Rep. 305. See, also, City of New Orleans v. Robira, 42 La.Ann. 1098, 8 So. 402, 403, 11 L.R.A. 141; Mullinnix v. State, 42 Tex.Cr. R. 526, 60 S.W. 768. Photography is defined as the science which relates to the action of light on sensitive bodies in the production of pictures; the fixation of images and the like. Frankel v. German Tyrolean Alps Co., 121 Mo.App. 51, 97 S.W. 961, citing Webs. Dict. In our judgment a photographer may be said to be a professional person. Ordinarily the relationship of employer and employee does not exist between one engaged in a profession and another who engages such services for a limited purpose. It is from the facts of the employment that one must determine whether a professional person is an employee under the act. If there is a question as to whether the relationship of employer and employee exists generally it may be determined by the usual tests relevant to any particular employment inquiry. We conclude that this particular finding of fact does not contain sufficient factual data upon which to draw any legal conclusion for which it was intended as a predicate. Therefore, on retrial the court is directed to take

evidence from which a legal conclusion can be drawn.

The members of Classes (i), (j), and (k) are described by the findings as "concessionaires," "who purchase for their own account food, candy, ice cream, soft drinks, cigarettes, cigars, coffee, and other types of refreshments, which are sold by persons employed and compensated by said concessionaires." Webster's Int. Dict., 2nd Ed., defines the word "concessionaire" as "The beneficiary of a concession or grant; specific., the lessee or grantee of a concession (sense 5), as at an amusement park, seaside resort, etc." while the "sense 5" referred to is defined as "A grant or lease of a portion of premises for some specific use, or of a right to enter upon premises for some specific purpose; as, a concession at a fair for a lunch counter." See, also, Rendall v. Pioneer Hotel & Tucson Junior Chamber of Commerce, 71 Ariz. 10, 222 P.2d 986.

We think it clear that Classes (i), (j), (k), and (n) (all concessionaires) consist of independent contractors and that they do not fall within any definition of employees.

We come finally to the crux of the case, which is the effect of Finding 42. This finding so far as material to the issue reads as follows: "That under the provisions of said plan, or plans, under which a license was issued to the respective plaintiffs, and under which said respective plaintiffs were required to operate, and did operate, under said license from the State Tax Commission, the several persons in the service of the licensee and the duties they were required to perform were so integrated, interdependent, and inseparable, in carrying out the intent and purpose of Article 16, Chapter 73, Arizona Code Annotated 1939, as amended, that it was impractical or impossible to so operate as to constitute any of such persons an independent contractor or independent agent; and that it was necessary and essential at all times that the licensee responsible to the State Tax Commission to retain the right, and that degree of supervision, over all persons who performed any personal service in connection with the conduct of a racing meet under such license or licenses as to constitute such persons employees, workmen, operatives, or contractors subject to the right of supervision and control within the meaning of Articles 9 and 12, Chapter 56, A.C.A.1939 as amended and supplemented. That all of the persons and classifications of employments mentioned in Findings No. XXVII to No. XLI inclusive were, and are, employees, operators, or contractors, subject to the right of supervision and control of several plaintiffs for whom they perform services under the facts as alleged under the provisions of 56-928(a) and (b)."

We think the essential portion of this finding may be summarized as follows:

(1) The work to be performed by the various classes of persons in dispute is of such a nature that it is impossible of per-

formance by an independent contractor and hence all are employees of the licensee. In order to make plaintiffs responsible for compensation for injury to these classes, it is necessary and essential that they have sufficient control of the employee's immediate employers to bring them within the provisions of the independent contractor statutes, Secs. 56-928 and 56-930. Although worded as a finding of fact, we think in substance it constitutes a conclusion of law. So far as (1) above is concerned, the working of the *specific* findings of fact describing the nature of the work performed by each disputed class shows clearly that in some of the classes, such as (f) gate man, and (h) employees of mutuel man, the immediate employer is an independent contractor. The first conclusion of law (No. 1 supra) cannot be sustained.

(2) That it is necessary and essential that the licensee, on account of its obligations as a licensee, retain that degree or right of supervision sufficient to make the disputed classes its employees. It is upon this contention that the case of the commission must stand or fall.

Each class in dispute, except those governed by other principles as set forth in this opinion, has an *immediate* employer someone other than the plaintiffs. In order, therefore, to make plaintiffs liable for their insurance, they must bring themselves within the second class described in Sec. 56-928, supra, by showing their *immediate* employer is "subject to the supervision or control" of plaintiffs, and this must appear affirmatively in the record *as a finding of fact*. Blasdell v. Industrial Comm., 65 Ariz. 373, 181 P.2d 620; Aluminum Co. of America v. Industrial Comm., 61 Ariz. 520, 152 P.2d 297; Ison v. Western Vegetable Distributors, supra. It is true the act should be given a liberal construction, United States Fidelity & Guaranty Co. v. Industrial Comm., 42 Ariz. 422, 26 P.2d 1012; Goodyear Aircraft Corp. v. Gilbert, 65 Ariz. 379, 181 P. 2d 624, and that the courts will not countenance acts or omissions to avoid the statute, United States Fidelity & Guaranty Co. v. Industrial Comm., supra; Industrial Comm. v. Meddock, supra. But neither the commission nor the trial court may *assume* the existence of the jurisdictional relationship of employer-employee merely because such relationship is necessary to support the further action of the commission. *Such fact must appear from the evidence in the record,* and be found to exist from such evidence *as a fact.*

There is no intimation in the findings of fact that plaintiffs have been guilty of any illegal or improper attempt to avoid or evade the law. It may be true that to compel plaintiffs to take out compensation insurance for the disputed classes, rather than to place the responsibility on the *immediate* employer, would give more complete and satisfactory protection to the employees, and that it would be easier and more convenient for the commission

to issue policies under such a procedure, but such liability must be imposed by the legislature and not by the commission or the courts. The legislature has specified with great particularity the circumstances under which liability for compensation can be imposed on account of one not directly in the service of the alleged employer, and it is the only authority which can extend that liability, no matter how desirable, convenient, or expedient such extension may be. It is beyond the power and jurisdiction of the commission to assume as a matter of law there is a supervision or control which does not *as a matter of fact* appear to exist, and this is what Finding 42 attempts to do. We hold, therefore, for the reasons above set forth, that under the findings of *fact* of the trial court, plaintiffs are not required to provide compensation insurance for any of the classes in dispute except (*l*), (m), and perhaps Class (g), photographers.

The commission has the undoubted power to issue insurance policies and the discretion to refuse to issue them *under proper circumstances*. West Chandler Farms v. Industrial Comm., supra; Gene Autry Productions v. Industrial Comm., supra. This discretion however must be a reasonable and not an arbitrary one. Since it appears from the record that plaintiffs are ready, able, and willing to comply with all the legal requirements of the commission in regard to an insurance policy, an order refusing to issue a policy unless plaintiffs also complied with illegal requirements is "unreasonable and unlawful" to that extent.

The only remaining question is whether, as contended by the commission, the state of Arizona is the ultimate employer of all those engaged in the operation of the racing meets in question, and therefore liable to the commission for premiums on all such employees. The basis for this contention is that the state of Arizona is a participant or joint adventurer in any racing business which is licensed by it, assertedly for the purpose of raising revenue from a business "which is otherwise outlawed." By Ch. 61, Sess. Laws 1949, the legislature created the Arizona Racing Commission, provided for commissioners, and established the powers and duties of the commission. The racing commission has authority to issue permits to licensees to conduct racing meets in accordance with its rules and regulations. A limitation is placed on the number of days on which racing can be conducted in the various class counties, depending upon population. The act also legalizes pari-mutuel wagering and prohibits all other forms of wagering or betting on the results of a race except as provided in the act. The racing commission is also authorized to license and permit racing at the state and county fairs. The state shall "receive five per cent of all money handled in the pari-mutuel pool operated by the permittee, to be paid daily during the rac-

ing meeting. No fees shall be collected from any state or county fair for a racing meeting held in connection with a fair and operated in such manner that all profits accrue to the fair association, which profit shall not exceed fourteen per cent of the total amount of money handled in the pari-mutuel pool."

Counsel for the commission recognizes that the state is not in partnership with the owners of businesses and professions licensed or taxed by it, but he insists that there is a "clear and inescapable distinction between legislation licensing an outlaw business for the purpose of raising revenue and the levying of an excise tax upon legitimate business." We are unable to discern this "clear and inescapable distinction." There is little need to cite authority for the proposition that a race track is normally considered a place of amusement. The state under its police powers has seen fit to validate the business, to license and regulate it, and for the purpose of raising revenue has exacted of the licensee a certain percentage of the total pari-mutuel· deposits for the privilege of conducting a race meet with pari-mutuel betting.

Adopting appellees' position it would be equally valid to argue that each licensed liquor dealer in the state should be regarded as an administrative agency of the state in the conduct of his everyday business and his employees, employees of the state.

See Madden v. Queens County Jockey Club, 296 N.Y. 249, 72 N.E.2d 697.

The judgment rendered by the superior court of Maricopa County is reversed and remanded with instructions; first, to grant a new trial for the purpose of determining the status of the class designated as (g), photographers, and second, to render judgment in accordance with the opinions expressed herein.

UDALL, STANFORD, PHELPS and DE CONCINI, JJ., concurring.