ST. REGIS PAPER CO., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 79–4–00673

*Herrick & Larsen (Herbert Peter Larsen* at the trial and on the brief) for the plaintiff.

*Richard K. Willard,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office *(Barbara M. Epstein* at the trial and on the brief) for the defendants.

*Soller, Singer & Horn (Gerald B. Horn* and *Margaret H. Sachter* on the brief) for Amici Curiae.

(Decided August 19, 1987)

RAO, *Judge:* This test case involves the proper tariff classification of merchandise imported from West Germany in 1978 and known as "black calendared paper" or "Erfurt base paper." The merchandise was classified by the Customs Service of the United States (Customs) under Tariff Schedule of the United States (TSUS) item 252.90 as "paper, not impregnated, not coated, not surface-colored, not embossed, not ruled, not lined, not printed, and not decorated: weighing over 18 pounds per ream: other, at a duty rate of 10 per cent ad valorem.

Plaintiff claims that the merchandise is properly classifiable under item 252.05, TSUS, as basic paper to be sensitized for use in photography, at a duty rate of 1 per cent ad valorem.

The merchandise is imported in rolls and is neither sensitized nor wholly or partly covered with flock, gelatin, metal or metal solutions. After importation, it is sensitized with zinc oxide and used as

a "photomaster" in a xerographic photocopy machine manufactured by Pitney Bowes.

An image is produced by first charging and exposing the sensitized paper to electromagnetic radiation and then transferring and fusing the image onto copy paper.

The process was more completely described by plaintiff's witness, Mr. Paul Wacher, an employee with plaintiff corporation, in charge of electronics communications operations. He testified that within the Pitney Bowes copy machine, a built-in light source exposes the original document in a scanning fashion. The light is reflected from the original document onto the surface of the sensitized imported merchandise in an "image-wise" fashion so that the dark or image areas of the original reflect less light to the surface of the "photomaster" than the nonprinted area of the original. The imposition of the light reflected from the original causes the charge previously placed on the surface of the photomaster to dissipate, leaving a latent electrostatic image which is not visible to the naked eye, on the surface. The image is made visible by bringing an oppositely charged ink-type particle into contact with the surface containing the latent image. This temporary image is made permanent by being transferred to ordinary, plain paper where it is then fixed by heat and made permanent.

It is this process which plaintiff claims is a process encompassed by the work, "photography," as used in the Tariff Schedules of the United States.

Defendant, besides relying on its statutory presumption of correctness, takes the position that this process is not within the definition of "photography" since the definition of this word does not include the photoelectrical process described by Mr. Wacher, but is limited to those processes where a chemical reaction is caused in the material, usually silver halide. Defendant also claims that the imported merchandise does not have the physical characteristics of paper intended by Congress to be necessary for paper classifiable as paper to be sensitized for use in photography, i.e., chemical purity and exceptional wet strength.

The question before the Court is whether the term, "photography," encompasses the process described above, i.e., xerography or electrophotography. In asserting that it does, plaintiff relies on various definitions of both these terms, found in dictionaries and scientific treatises. *Webster's Third New International Dictionary* (1961) defines "xerography" as follows (at 2644):

> "xerography * * * n [* * *] the formation of pictures or copies of graphic matter by the action of light on an electrically charged photoconductive insulating surface in which the latent image usu. is developed with powders that adhere only to the areas that remain electrically charged and in which the image formed by the powders sometimes is transferred to a sheet of paper."

The same source provides the following definition of "photography" (at 1702):

> "photography * * * 1: an art or process of producing a negative or positive image directly or indirectly on a sensitized surface by the action of light or other form of radiant energy * * *"

In *Van Nostrand's Scientific Encyclopedia* (1976) the term, "photography" is defined as:

> "A technology in which processes and techniques are used to produce images through the action of electromagnetic radiation. The term embraces all processes employing materials sensitive to visible light, or to other forms of radiant energy, such as ultraviolet, infrared, x-ray, radiation from radio-active materials, etc."

Additionally, plaintiff relies on *Neblette's Handbook of Photography and Reprography,* 7th Edition, Ed. John M. Sturge (1977), which is recognized as an outstanding reference work on photographic technology. It describes the electrophotographic process at p. 331:

> First, there must be a camera to convert the input object into an aerial image of the necessary irradiance. This image exposes an element, the photoreceptor, which has been made light-sensitive by an electrical process. Exposing the sensitized photoreceptor to an aerial image creates an electrostatic latent image on the photoreceptor. The latent image can be converted to a visible or otherwise physically detectable image by a wide variety of development methods. Finally, to have a useful output often requires manipulating the developed image in some manner. This may include, among many possibilities, transferring the image to a new support, fixing the developed image, transporting the fixed image to the user, or providing particular arrangements for viewing the image. Some systems require several additional steps, for example, cleaning, to prepare the photoreceptor for a second exposure.

*Neblette's* discusses those elements that distinguish the electrophotographic process from the silver halide process. The first is the electrical driving force, which is unique to electrophotography, and second is the photoreceptor [the merchandise in issue]. The author goes on to say, at p. 332:

> While no silver halide or gelatin is used in electrophotography, the key difference is that the electrophotographic image is electrostatic while the silver halide latent image is atomistic. Finally, development in electrophotography is a physical rather than a chemical process. For example, the latent image may be developed by attracting a light-absorbing material, called toner, to the photoreceptor by electrostatic forces, or development may be by causing these same forces to induce a physical change in a nearby material layer. Chemical reactions are never directly involved in the development step.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

The cameras in electrophotographic systems are similar to those used in ordinary photography. The difference is that for most copier applications it is a scanning system which is physically attached to the other subsystem to make an automated complete package.

Electrophotography is defined as photography in which images are produced by electrical means (as in xerography), *Webster's New Collegiate Dictionary,* 1st Edition (1973). The term "electrostatic printing" has been defined as a process (as xerography) for printing or copying in which electrostatic forces are used to form the image (as with powder or ink) directly on a surface.

It is the opinion of the Court that the common meaning of the term "photography" should be construed as encompassing any process in which images are produced directly or indirectly on a sensitized surface by the action of light or other form of radiant energy. In this we are guided by precedents set in various jurisdictions, as well as by the definitions cited *supra.*

The earliest case found by the Court was *City of New Orleans* v. *Robira,* 8 So. 402, 403, 42 La. Ann 1098, 11 L.R.A. 141 (1890), which involved the licensing of photographers. The court held:

"Photography" is defined as "the science which relates to the action of the light on sensitive bodies, in the production of pictures by the fixation of images and the like." Webst. Dict. It is *also* said to be "the art of producing images of object by an application of chemical change produced in certain substances by action of light, or more generally, by radiant energy." Century Dict. [Emphasis supplied]

Thus, as early as 1890, the process of producing images by an application of chemical change, e.g., silver halide photography, was recognized as being one of several possible processes within the broad definition of "photography." This broad definition for the word "photography" has been variously applied. In *States* v. *Matheson,* 103 N.W. 137, 138, 130 Iowa 440, 114 Am. St. Rep. 427 (1905), the court took judicial notice of the fact that "photography is the art of producing facsimiles or representations of objects by the action of light on a prepared surface. In *Frankel* v. *German Tyrolean Alps,* 97 S.W. 961, 962, 121 Mo.App. 51, the court cited with approval the definition of "photography" found in *Websters Dictionary* as "the science which relates to the action of light on sensitive bodies in the production of pictures: the fixation of images and the like * * *" This case was cited with approval in *Haggard* v. *Industrial Commission,* 223 P.2d 915, 926, 71 Ariz. 91 (1950).

More recently, the electrostatic process was described in *Advance Business Systems & Supply Co.* v. *S.C.M. Corp.,* 287 F.Supp. 143, 148 (1968) [Footnote 3]:

In the electrostatic process, the surface of the original, (i.e., the document or other object to be copied) is exposed to light and reflected onto an electrically charged surface. Where the

light strikes the electrically charged surface, the electrical charge is dissipated and an invisible latent image is formed. The latent image is exposed to "toner", which clings to the charged areas and forms a visible image. This image is then fused to the copy paper.

The term "photography" has also been interpreted by our predecessor court in the case of *Hensel, Bruckman & Lorbacher* v. *United States,* 30 Treas. Dec. 814, T.D. 36419 (1916), in which the Board of General Appraisers considered the proper classification of paper used as a screen and placed between a photographic plate and an xray machine. Customs had claimed that the xray process is not photography within the common and ordinary understanding of that term. The Board held that it was, since "as a result of the operation of the xray upon the xray plate, with the aid of this paper screen and through the chemical action of light, permanent pictures or images of objects are produced * * *"

The broad definition of photography was again adopted by the Customs Court, our predecessor court, in *American Mechanographic Corp et al.* v. *United States,* 25 Cust. Ct. 261 (1950), in which the Court cited *Websters New International Dictionary,* 2nd Edition (1948), in considering whether the film strips used to produce sound tracks for motion pictures were classifiable as photographic film:

> photography, n. 1. *Photog.* the art or process of producing images on sensitized surfaces by the action of light or, more generally, of any form of radiant energy. The images produced may be either visible, in which case they must be fixed by the removal of the unchanged sensitive material, or invisible * * *, when by further chemical treatment, known as development, a visible image is produced. The material used for the negative in modern photography is a glass plate, or more commonly, a transparent flexible film coated with an emulsion of silver halide suspended in gelatin. After development the unchanged silver halide is removed by solution in thiosulphate, and the fixed negative is then washed and dried. From the negative any number of positives may be printed on sensitized surfaces, which usually consist of silver chloride suspended in gelatin and coated on paper, or, in the case of the motion-picture film, a positive film similar in composition to that used for making the negative.

In this definition the broad scope of the term is given first, followed by its application in the field of what was, in 1950, considered modern photography.

The first commercial use of a xerographic machine occurred in 1950, although experimentation with similar processes date back as far as 1777. *Neblette's, supra,* at 333. Since 1950, there has been tremendous growth in the commercial application of electro-

photography, as well as the invention of totally new electrophotographic imaging technologies. *Id.* Additionally, many insights into the science and technology involved inall phases of classical electrophotography were obtained during the 1950s and 1960s. *Ibid* at 334. Thus, the commercial applications were commonly known, and assuredly technologically known, in 1962 when the YSUS was enacted, and Congress, had it considered electrophotography to be outside the scope of the term photography, could have provided separate item numbers under which papers to be sensitized for use in electrophotography would have been classifiable. Since Congress made no separate provision for such paper, even though it or similar paper used in electrophotography existed at that time, it can be concluded that Congress intended to include paper to be sensitized for use in electrophotography under the same item as that which encompasses paper to be sensitized for use in photography.

Even assuming, *arguendo,* that Congress, in 1962, was unaware of the commercial applications of the electrophotographic process and its relation to photography, it can still be concluded that the instant merchandise is classifiable under 252.05, TSUS. It is a well established principle of Customs law that tariff acts are made not only for the present, but for the future as well, thereby embracing articles produced by technologies which may not have been widely employed or known in commerce at the time of the enactment of the original provision. *Davis Turner & Co.* v. *United States,* 45 CCPA 39, C.A.D. 669 (1957). Since electrophotography was recognized as a form of photography at the time that the merchandise was entered (as virtually admitted by defendant's witness, Ira Seldin, when he stated that the Pitney Bowes process is a process which uses image formation through exposure to light [Tr. at 70], it can be concluded that this process was included in the term photography at the time that it became commercially feasible.

We come, finally, to defendant's argument that the merchandise does not possess the chemical purity and exceptional wet strength which Congress intended to require for paper classifiable under item 252.05, TSUS. Defendant cites the 1960 *Tariff Classification Study,* Schedule 2, Part 4, where it is stated:

> Item 252.05—The provision for basic paper to be sensitized for use in photography presently dutiable at 2.5 percent ad valorem in paragraph 1450 would be continued in item 252.05 without material change. Such basic paper for photographic use can be made from either rag or chemical wood pulp and must have a high degree of chemical purity and exceptional strength when wet.

Defendant also relies on tests of purity and wet strength performed by the Customs Laboratory and the testimony of plaintiff's witness that the paper at issue does not possess these qualities to a high degree.

The 1960 *Tariff Classification Study,* prepared by the United States Tariff Commission, was specially produced for the use of the Congressional committees considering tariff proposals, i.e., the Committee on Ways and Means of the House and the Committee on Finance of the Senate. It has long been recognized as authoritative in helping courts resolve questions relating to the meaning and scope of terms which appear in tariff acts and in ascertaining congressional intent. *Textile Printing and Finishing Co., Inc.* v. *United States,* 49 CCPA 24, C.A.D. 789 (1962). They may and should be resorted to where a word has more than one common meaning, either of which may suitably fit the context, to determine the intent of the legislature. *United States* v. *Jos. Riedel Glass Works, Inc.,* 32 CCPA 201, C.A.D. 307 (1945); *United States* v. *Mercantil Distribuidora, S.A. et al.,* 43 CCPA 111, C.A.D. 617 (1956).

We also note that the defendant, in its brief, has asked the Court to consider definitions of the term photography that limit it to the *chemical* process which requires silver halide and the wet strength and purity in the paper used in that process.

However, statements in the *Tariff Classification Study* do not establish the common or commercial meaning of terms used in tariff acts. The common meaning of a tariff term is not a question of fact, but a question of law to be decided by the Court. *United States* v. *Floria & Co., Inc.,* 25 CCPA 292, T.D. 49396 (1930); *American Express Co.* v. *United States,* 39 CCPA 8, C.A.D. 456 (1951). Courts may, and do, consult dictionaries, lexicons, scientific authorities, legislative histories, and other reliable sources of information as aids to their determinations. *United States* v. *John B. Stetson Co.,* 2] CCPA 3, T.D. 46319 (1933).

It is the conclusion of the Court, after reviewing the definitions of the term "photography", the treatises which dealt with the development and commercial use of the electrophotographic process and the use of the broad definition of the term "photography" used by courts throughout the United States for almost one hundred years, that the broad definition of photography was intended by Congress to apply to the paper enumerated in item 252.05, TSUS. The presumption of correctness which attaches to the Customs' classification has been overcome by the evidence adduced by plaintiff at trial and the information provided to the Court in plaintiff's and *amici's* briefs.

It is the determination of the Court that the imported paper is paper to be sensitized for use in photography and is properly classifiable under item 252.05, TSUS. Judgment entered accordingly.