706 P.2d 1219

Dan CRACCHIOLO and Joseph U. Cracchiolo, Plaintiffs/Appellants,

v.

STATE of Arizona; State Land Department of the State of Arizona, Joe T. Fallini, State Land Commissioner; Arizona State Department of Health Services; James E. Sarn, M.D., M.P.H., Director of the Department of Health Services; the City of Sierra Vista, Defendants/Appellees.

No. 2 CA–CIV 5324.

Court of Appeals of Arizona, Division 2, Department A.

June 13, 1985.

Review Denied Sept. 10, 1985.

Lesher & Borodkin, P.C. by Robert O. Lesher, Tucson, for plaintiffs/appellants.

Fauver & Till by Jerry Till, Sierra Vista, and Gregory D. Lantz, Tucson, for defendant/appellee City of Sierra Vista.

Robert K. Corbin, Atty. Gen. by Jon K. Wactor, Phoenix, for defendant/appellee State of Arizona.

## OPINION

BIRDSALL, Presiding Judge.

In this decision we revisit Section 34, Twp. 21 South, Range 21 East, G & SRB & M, in Cochise County, Arizona. This very cause, Cochise County Superior Court No. 40463, was before us on an appeal from an order granting a temporary injunction. That decision is reported as *Cracchiolo v. State*, 135 Ariz. 243, 660 P.2d 494 (App. 1983). We vacated the injunction, finding, in part, that the plaintiffs Cracchiolo had an adequate remedy at law for damages.

Our supreme court has also had occasion to decide a controversy concerning Section 34 and involving these same parties, the Cracchiolos, the State of Arizona, and the City of Sierra Vista. In *Arizona State Land Department v. Superior Court*, 129 Ariz. 521, 633 P.2d 330 (1981) the court held that a sale of the land to the city was void. And in *City of Sierra Vista v. Babbitt*, 129 Ariz. 524, 633 P.2d 333 (1981), decided the same day, it was held that the city was entitled to be reimbursed by the state for both the purchase price paid for the land and for the value of improvements which the city had placed upon it. A third case decided by the supreme court at the same time is *Gladden Farms, Inc. v. State*, 129 Ariz. 516, 633 P.2d 325 (1981). The cases were interrelated since they were all concerned with attempted sales of school trust lands. The supreme court held that under the Enabling Act for admission of Arizona and New Mexico into the United States, Ariz. Enabling Act, §§ 19–35; Act June 20, 1910, § 28, 36 U.S.Stat. 557, 568–579; Ariz. Const. Art. 10, § 1 et seq.; Ariz. Const. Art. 20, Par. 12; such trust lands are not to be sold except to the highest and best bidder at public auction. The state, acting through the state land commissioner, had sold Section 34 to the city without complying with this requirement. The city had purchased the land for the purpose of constructing wastewater treatment facilities to accommodate the rapid population growth of the city. Upon obtaining possession pursuant to the sale, the city placed such improvements on the land at a cost of approximately $4,200,000. About $3,600,000 of these funds were supplied by the federal government through the Environmental Protection Agency (EPA). *Cracchiolo*, supra. These then were the improvements the value of which was to be paid to the city by the state.

Thus, upon issuance of the mandate by the supreme court in *Arizona State Land Department*, supra, the parties, other than the Cracchiolos, were left in an unenviable position. The water treatment facility for the city would be owned by the state for the benefit of the common schools. To escape this predicament, the state immediately accomplished a ten-year institutional lease of Section 34 to the State Department

of Health Services. See A.R.S. §§ 37–441 through 443. The land was valued at $1,900 per acre, total $1,216,000, and the state received $97,280 annual rent for the benefit of the common schools. The rent is paid by the city, which operates the facility by virtue of an intergovernmental agreement with the state acting by and through the Arizona Department of Health Services. See A.R.S. §§ 11–951 through 954. The injunction which this court vacated in *Cracchiolo*, supra, would have prevented the city from using its facility for the treatment of its wastewater. Fortunately, the trial court had also stayed the effect of the injunction and the operation of the facility was not interrupted.

The Cracchiolos were, at the most, holders of a grazing lease for Section 34, which entitled them to graze seven head of cattle. They first leased the land in 1957 and the lease had been renewed at intervals, *the most recent of which expired May 31, 1984.* The lease provided for rent of $100 per annum to be paid to the state. No rent has been paid since 1979, the year of the aborted sale. The Cracchiolos, Dan and Joseph, are brothers. They are both attorneys. We consider this relevant because of the complexity of this litigation and the issues presented, at least one of which is claimed to involve lack of notice to them.

The complaint in this case was filed by the Cracchiolos in August 1981, almost contemporaneously with the institutional "taking" by the Department of Health Services. It sought, inter alia, damages for trespass from both the state and city. The case was tried to the court in November 1983. Pursuant to request, the trial court made findings of fact and conclusions of law. Rule 52(a), Rules of Civil Procedure, 16 A.R.S. The court held that the lease of the school trust land to the State Department of Health Services was valid. It also found that the appellants Cracchiolo were entitled to damages of $11,436 resulting from the loss of their improvements on Section 34, and $466.67 for the loss of their grazing lease, to and including its expiration, May 31, 1984. Judgment was entered for these amounts to the Cracchiolos and for costs and attorney fees to the state as the successful party.

This appeal followed.

The appellants contend: 1) that no damages were awarded to them for the period from February 1980, the possession of the city under the void sale, to August 21, 1981, the institutional taking; 2) that the institutional lease was unlawful and therefore void as contravening the Enabling Act and the Arizona Constitution; 3) that no damages were awarded for their loss of possession to May 31, 1984, and also for such time as the lease could have been expected to continue; and 4) they are entitled to other damage above that allowed.

We hold that the institutional lease is valid and affirm the damage award of $466.67, but disagree with the legal reasoning of the trial court in arriving at the award of $11,436 for the improvements. We remand for a redetermination of that element of damage.

In contrast with the sums awarded by the trial court, the appellants claim they are entitled to damages totaling $1,126,839.52. We believe these are highly exaggerated claims of damage. The appellants are seeking to balloon the right to graze seven head of cattle upon 640 acres of desert under a very restrictive lease and for only four-plus years into a million dollar damage claim.

## The Institutional Lease

To some extent, this issue may now be moot, at least as to the appellants, since their grazing lease has expired. Moreover, Section 34 was sold to the city in April 1984 at public auction, allegedly in compliance with A.R.S. § 37–231 (Supp.Pamph.1984), et. seq. The Cracchiolos challenged that sale in superior court in Maricopa County. The sale was upheld and they have appealed to Division One of this court. Those proceedings were not before the trial court here, but are related in the state's answering brief and were admitted in oral argument. However, our review of the complaint and the pre-trial order reveals that in one count the appellants alleged their status as taxpayers and that the state had breached fiduciary duties to the common schools. They sought to have the lease and government agreement be declared invalid. The pre-trial order also contained the validity of the taking as an issue. The issue is also relevant to their alleged damage, and that may explain the pre-trial issue and the court's conclusion deciding the issue. Nevertheless, even though it appears the appellants may have abandoned every count except trespass, we believe we should specifically affirm the validity of the institutional taking.

We observe that any suggestion that the common schools have suffered damage is preposterous. Before the taking they were

entitled to only $100 rent per year. They now receive almost $100,000 annually. That is not just a tenfold or hundredfold, but rather a thousandfold increase.

School trust lands may be leased. A.R.S. § 37–132(A)(5) and (6) (Supp.Pamph.1984). This statutory authority does not offend the provisions of the Enabling Act since fee title to the land is undisturbed. See *Grossetta v. Choate*, 51 Ariz. 248, 75 P.2d 1031 (1938). A.R.S. § 37–441 specifically provides for the institutional lease here involved. It reads:

"The state may, when necessary for its uses or for the uses of any state department or institution, take over any state lands and the improvements thereon by reimbursing the owners for the improvements, and the department or institution so using the lands shall lease them and pay such rental as the state land department requires."

The procedures then next required by A.R.S. § 37–442 were followed for this taking, except as hereafter discussed.

"A. The governing board or officer of a state department or institution desiring to avail itself of the provisions of this article shall make application to the governor for taking the lands over, and, if the application is approved by the governor, it shall be transmitted to the state land department which shall appraise the improvements on the lands.

B. The existence of a permit or lease for the land desired shall not bar the state from taking the land, but the permittee or lessee shall be entitled, in addition to the appraised value of the improvements on the lands, to reasonable compensation for damages he may sustain by reason of the cancellation of the permit or lease prior to its termination. Such damages shall be determined as a part of the appraisal.

C. Upon surrender of the lands to the state, the owner of the improvements shall be paid in the manner provided by law the appraised value thereof and the amount of the damages. The owner of the improvements shall prior to payment file his claim, and certify that the possession of the lands and improvements has been surrendered to the state by all persons having lawful claims thereon."

Application was made to the governor, he approved, and the approved application was transmitted to the state land department. The improvements were not re-appraised, apparently since that had been done in 1979 in connection with the aborted sale. Neither were the lessees' damages ascertained. The state's explanation for this deviation from the statutory requirement was the appellants' almost immediate filing of the complaint in this case. We find that explanation not only satisfactory but also believe it answers the appellants' complaint that they received no notice of the taking. They obviously had actual notice at or near the time. They could not have prevented the taking. A.R.S. § 37–442(B), supra, so provides. We do not believe these omissions are cause to void the institutional lease. We agree with the conclusion of the trial court that there was substantial compliance with the statutes and no violation of the constitution or Enabling Act. We also agree that, under the facts of this case, there was no need to reclassify the land from grazing prior to the taking. It is obvious from the documents that the purpose of the taking was to enable the land to be used as improved, that is, for a wastewater treatment facility. This was, as the governor found, a necessary use by the Department of Health Services in a critical emergency. Evidence in the trial court supported the potential health problem confronted by the city.

The appellants contend that the Department of Health Services (DHS) had no authority to be the party to the institutional lease. They do not argue that DHS is not a state department or institution. They contend that this taking was not for the use of the state or DHS, but rather for the use of the city of Sierra Vista. Intertwined with this argument is another, that there is no statutory authority for this activity by DHS. Before specifically addressing these contentions, we dispel another closely related assertion that DHS has no power to operate a wastewater treatment facility. As the appellees point out, under the intergovernmental agreement, the city, not DHS, is operating the facility.

The trial court made the following conclusion of law concerning the validity of the institutional lease:

"The institutional taking effected by the Department of Health Services was valid and in substantial compliance with the requirements of A.R.S. §§ 37–441, 37–442 and 37–443, as well as the Arizona Constitution and Enabling Act. In this connection the Court concludes that, 1) there was not requirement that Section 34 be re-classified prior to the taking, 2) the appraisal was reasonably con-

456

ducted and accurately reflects the true rental value of Section 34, 3) there was no need for the Land Department to obtain the approval of the Board of Appeals since this was a taking pursuant to Article 9 of Title 37, rather than a commercial lease pursuant to Article 4, Title 37, and 4) the failure to give Plaintiffs formal notice of the intended institutional taking did not prejudice Plaintiffs since Plaintiffs could not have prevented the taking. A.R.S. § 37–442(B)."

We agree with these conclusions. The trial court does not directly address the appellants' contention that "the taking was unauthorized by law to be made for the stated and intended purpose." The taking was approved by the governor pursuant to certain designated provisions of Title 36, Public Health and Safety. The entire text of the governor's letter of August 14, 1981, follows:

"The City of Sierra Vista has sought help from this Office in regard to their sewage treatment plant. As you are aware, Sierra Vista received a grant from the U.S. Environmental Protection Agency (EPA) to construct their sewage treatment plant on land purchased from the State Trust. The new sewer plant was needed to correct serious health and environmental problems which were the subject of an EPA Finding and Order dated September 28, 1978.

Following a lawsuit instituted by former lessees of the State land, the Arizona Supreme Court declared the sale of State land to the City to be void and the ownership of the land reverted to the State Land Trust. There are doubts about the City's legal ability to continue to operate their new sewage treatment plant under the existing circumstances.

If the City is unable to carry out its sewage treatment program, there is an immediate risk of malfunction of the treatment plant and a resulting serious danger to the health of the people of the State. Untreated sewage would be released from the facility and could directly promote disease as well as pollute the ground and surface waters of the State.

In light of these significant risks to the public health and welfare, I am, pursuant to A.R.S. §§ 36–132.A.1 and A.4, and 36–136.A.2 and A.6, assigning to the Department of Health Services the responsibility for assuring the continued operation of this facility until you are certain that there is no risk to the public. This re-

sponsibility is to be assumed as soon as possible. You may use your discretion in this matter to delegate the on-site operational responsibility to the entity most capable of operating the facility.

Please keep me informed of your progress on this matter."

The statutes cited, A.R.S. §§ 36–132(A)(1) & (4) and 36–136(A)(2) & (6) (Supp.Pamph.1984), follow:

"A. The department shall, in addition to other powers and duties vested in it by law:

1. Protect the health of the people of the state.

\* \* \* \* \* \*

4. Operate such sanitariums, hospitals or other facilities assigned to the department by law or by the governor.

A. The director shall:

\* \* \* \* \* \*

2. Perform all duties necessary to carry out the functions and responsibilities of the department.

\* \* \* \* \* \*

6. Exercise general supervision over all matters relating to sanitation and health throughout the state. When in the opinion of the director it is necessary or advisable, a sanitary survey of the whole or of any part of the state shall be made. The director may enter upon, examine and survey any source and means of water supply, sewage disposal plant, sewerage system, prison, public or private place of detention, asylum, hospital, school, public building, private institution, factory, workshop, tenement, public washroom, public rest room, public toilet and toilet facility, public eating room and restaurant, dairy, milk plant or food manufacturing or processing plant, and also any premises in which he has reason to believe there exists a violation of any health law, rule or regulation of the state which the director has the duty to administer."

██ We agree that the taking was well within the broad authority given DHS to protect the health of the people of this state. We would not expect to find specific authority for an institutional lease of school trust lands improved with a multimillion dollar water treatment plant to DHS to be operated by the city owning the improvements. These facts are unique. Nevertheless, we believe the legislature im-

plicitly authorized such action in these statutes and A.R.S. § 37–441. Administrative agencies have powers, either expressly *or by implication* conferred upon them by the legislature. *Corporation Commission v. Consolidated Stage Co.*, 63 Ariz. 257, 161 P.2d 110 (1945). Not all standards accompanying a grant of powers need be set forth in express terms. *State v. Birmingham*, 95 Ariz. 310, 390 P.2d 103 (1964); *Dennis v. Jordan*, 71 Ariz. 430, 229 P.2d 692 (1951); *Haggard v. Industrial Comm.*, 71 Ariz. 91, 223 P.2d 915 (1950); and see *Southwest Engineering Co. v. Ernst*, 79 Ariz. 403, 291 P.2d 764 (1955).

This is reason enough to affirm the trial court's conclusion. We find it unnecessary to discuss other reasons relied upon by the appellees, as for example, A.R.S. § 36–1852, wherein DHS is designated as the state water pollution control agency for purposes of the federal Water Pollution Control Act, 33 U.S.C.A. § 1251, et seq. Because about 90 percent of the funds for the facility were provided by EPA, and because the grant required that the city retain sufficient interest in the site to assure operation of the project, 40 CFR 35.-935–3(b)(3), the appellees contend this is further reason to justify the taking and affirm the trial court.

### The Damage Issues

We turn now to the other issues, all of which involve damages.

The appellants are obviously wrong when they argue no damages were awarded. For the trespass upon their possessory interest from 1979, the void sale, to August 1981, they were awarded $100 per year. This was the amount they were obligated to pay as rent. They were also awarded damages for the balance of their leasehold interest to May 31, 1984, at the same rate. Except for their other claims of damage, which we discuss later, the only evidence presented by the appellants to prove damage to their leasehold consisted of the following testimony of Joseph Cracchiolo:

"Q: Mr. Cracchiolo, what effect, if any, does your being dispossessed from 34 have on the cattle operation as a whole in the sections surrounding?

A: Well, that's the other. The other way of looking at the loss of it is, take into consideration not only our experience, but the experience of others in leasing grazing lands and ranching in this state.

I look at that land and I determined that if we take the immediate past, and the growth of Sierra Vista, that that land, where it lies, will certainly not be able to be used for anything economically other than grazing for no less than 25 years from 1979. I can see no better use for that, and again I use the past in my experience. I have, therefore, a loss and the loss of rental value of the ranch unit of, right at no less than $15,000 per year.

Q: How does that loss arise?

A: Out of the fact that without Section 34, the land is worth $15,000 less than—the ranch is worth less.

\*    \*    \*    \*    \*    \*

Without Section 34—let's take the original ranch, the original ranch with Section 34 for grazing purposes, because of the peculiar location, because of its access, because of the grass that was on it and its quality, is worth $15,000 less than it is with Section 34.

Q: How do you know that? Is that just out of thin air?

A: No, that is not out of thin air. I have leased the ranch for as much as $30,000 in the last few years, and today, I am down to $12,000 for that same ranch, and the reason that I am down to 12, very frankly is, that my tenant cannot economically operate without Section 34."

We believe the trial court properly refused to accept this evidence as proof of the appellants' damage in this case. Although we do not necessarily agree with the finding that the damage was equal to the rental charged by the state, there is understandably no cross-appeal from that award and the only issue before us at the moment is whether the award should have been figured at $15,000 per year. The measure of damage is that amount which will constitute just compensation for the injury done (be it trespass or taking) considered in relation to the particular purpose for which the property may be used. More precisely, the proper measure of damage is the difference between the value of the leasehold before the injury and its value after the injury. See 75 Am.Jur.2d, Trespass, § 51 (1974). An accepted method of establishing the appellants' damage would have been by appraisal of the value of the leasehold for the period of time involved. No such evidence was presented by any party.

458

■ The asserted damage of $15,000 per year was clearly predicated upon subleasing the section together with other state land and other land owned by the appellants. A.R.S. § 37–283(A) (Supp.Pamph. 1984) provides, in part,

"A grazing lessee shall not sublease his lease or sell or lease pasturage to lands included in his lease, without written permission from the state land department."

The lease itself provided:

"(A) The lessee will not sub-let or assign the land herein described or this lease without the written consent of the State Land Commissioner, first obtained."

The trial court found:

"10. Plaintiffs have sub-leased Section 34 in the past, but have never secured the prior written consent of the State Land Commissioner or the Department."

Because the subletting of Section 34 was never permitted by the state, as required by both the legislature and the lease, it was unlawful. Without securing permission for the sublease, this was not a purpose for which the land could be used. We do not believe the owner of a leasehold can recover damages for an injury to the leasehold when the injury is to an unlawful use. Cf. *Gear v. City of Phoenix*, 93 Ariz. 260, 379 P.2d 972 (1963). Although *Gear* is a condemnation case, we believe it applies with equal force to damage for trespass, particularly under the facts of this case where the entry by the city was entirely innocent based upon color of title, and the state is charged as a joint tortfeasor. "[T]he distinction between a willful trespasser and an innocent one is that the former knows he is wrong and the latter believes he is right." *Joyce v. Zachary*, 434 S.W.2d 659, 661 (Ky. 1968).

In order to determine the "before" value of the leasehold, it is necessary, as we have said, to look to the purpose for which the leased land could be used. The only use permitted was the grazing of seven head of cattle. That is all any purchaser could acquire.

As to the leasehold improvements for that taking, the appellants were awarded $11,436. In that regard, the trial court made the following conclusion:

"The order of the State Land Department dated August 24, 1979 appraising Plaintiffs' improvements at $11,436.00 is final and conclusive as to the value of Plaintiffs' improvements because of Plaintiffs' failure to challenge the appraisal before the Board of Appeals. A.R.S. § 37–214(A) clearly requires that questions relating to 'classification or appraisal of land or improvements' be taken to the Board of Appeals. Other matters may be appealed directly to the Superior Court, § 37–214(D). Plaintiffs assert, ... that the order of the Commissioner as to the value of improvements was appealed and became Cochise County Case No. 38318. However, that case only challenged the validity of the sale without public auction, not the appraisal. Additionally, such an appeal directly to the Superior Court is not permitted by § 37–214. Having failed to exhaust their administrative remedies, the value of Plaintiffs' improvements was finally fixed by the Land Department."

■ We disagree with this conclusion and because there was other evidence to support a greater damage award we must remand for a new finding as to the amount of this element of damage consistent with this opinion. We disagree because in *Arizona State Land Department*, supra, our supreme court held the sale of Section 34 was *void*. Because the sale was void, we believe all the proceedings were void, including the appraisal of the improvements. Although we believe the trial court can consider the valuation determined at that time for whatever evidentiary worth it may have, we do not believe it conclusively establishes that value.

The appellants' major damage arguments follow.

1) As we have discussed, they contend that because of the loss of Section 34, they were required to reduce the cash rent for their entire ranch by $15,000 per year. They further contend that it could be reasonably expected their leases would be renewed for 25 years from 1979. They calculate the present value of their loss to be $160,000 (eight percent of $15,000 for 25 years).

2) They lost the supply of water which they drew from the well on Section 34. They claim this was an annual loss of $10,-000. We note that under their theory this amount would logically be included in their other $15,000 loss. Projected for the same 25-year expectancy, the present value is said to be $106,740.

3) The rental value of the section after construction of the wastewater treatment plant is $100,000 per year. They contend that, because they were entitled to the possession of the land, they were entitled to that rent, the amount the city agreed to pay. For this "loss" they claim $425,000 past damage for loss of the land alone, not the improvements.

4) Appellants claim they are also entitled to the rental value of the improvements. For this damage, they claim $341,949.52. Testimony at trial from appellants' expert indicated an annual rental value for the plant over its estimated life expectancy.

The trial court rejected all of these claims, making, in part, the following findings:

"6. The provisions of A.R.S. § 37–283(A) restrict the Plaintiffs' ability to sublease in that a grazing lessee must secure written permission from the State Land Department.

7. The terms of the lease agreement restricted the Plaintiffs' ability to validly sublease or assign in that prior, written consent of the State Land Commissioner was necessary.

8. The provisions of A.R.S. § 37–281(D) restrict the permissible uses of state leased land to those uses for which it was leased, i.e. grazing in this case.

9. Plaintiffs have not had a registered cattle brand for at least the last 15 years.

10. Plaintiffs have sub-leased Section 34 in the past, but have never secured the prior written consent of the State Land Commissioner or the Department."

These findings all have support in the evidence and the statutes cited so provide. The court would also have been able to find that the lease document contained the following relevant provisions:

"(A) The lessee will not sub-let or assign the land herein described or this lease without the written consent of the State Land Commissioner, first obtained.

\* \* \* \* \* \*

(K) That the State of Arizona shall be forever wholly absolved from any liability for damages which might result to the lessee herein on account of this lease having been cancelled, forfeited, or terminated prior to the expiration of the full time for which it is issued.

\* \* \* \* \* \*

(N) It is understood by the lessee that the establishment of any water right, or rights, shall be by and for the State of Arizona, and that no claim thereto shall be made by said lessee; such rights shall attach to and become appurtenant to the said land.

\* \* \* \* \* \*

(S) If at any time during the duration of this lease the whole or any part of the lease premises shall be taken for any quasi-public or public purpose by any person, private or public corporation, or any governmental agency having authority to exercise the power of eminent domain or condemnation proceedings pursuant to any law, general, special or otherwise, this lease shall expire on the date when the leased property shall be so taken or acquired and the Lessee shall have no compensable right or interest in the real property being condemned and shall have no compensable right or interest in severance damages which may accrue to the remaining lease property not acquired by condemnation proceedings. Net rent to be paid by the tenant shall be apportioned and paid to the date of such taking."

Regarding these damage claims, as we have already discussed, the appellants cannot recover for loss of use of land when the use was in violation of the terms of the lease.

■■■ In any event, we believe the appellants' assertion that their leases would have continued another 25 years is speculative and cannot form a basis for recovery of damage. Speculative renewals of leases are simply not compensable. See, e.g., *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946); *Scully v. United States*, 409 F.2d 1061 (10th Cir.), cert. denied, 396 U.S. 876, 90 S.Ct. 152, 24 L.Ed.2d 134 (1969) sub nom. *Meisinger v. Scully; Stroh v. Alaska State Housing Authority*, 459 P.2d 480, (Alaska, 1969); *State v. Platte Valley Public Power & Irrigation District*, 147 Neb. 289, 23 N.W.2d 300 (1946).

The appellants cite A.R.S. § 37–291 (Supp.Pamph.1984). That statute has to do with preferred rights of renewal as between competing applicants. It does not give a preferred right as against the state. *Manning v. Perry*, 48 Ariz. 425, 62 P.2d 693 (1936). Moreover, see subparagraph B of A.R.S. § 37–291 (Supp.Pamph.1984):

"The preferred right of renewal shall not extend to a lessee who has not substantially complied with the terms of his

lease or who has not placed the land to the use prescribed in the lease during the term thereof or within the time prescribed therein, unless for good cause the failure to perform was given written authorization by the department. If the department determines the continued leasing of the land not in the best interest of the state, the lease shall not be renewed."

■ Damages for loss of a leasehold interest are limited to the unexpired term of the lease. *Pepsi-Cola Metropolitan Bottling Co. v. Romley*, 118 Ariz. 565, 578 P.2d 994 (App.1978).

Much of the foregoing precludes appellants' claim for damage on account of the water from Section 34, even if supported by the evidence. In addition, the lease provision precludes a claim for any use of the water except for the seven head of cattle which could be grazed on Section 34.

■ We reject the appellants' claims for damages based on the amount the city agreed to pay for the leased land, $100,000, and for the rental value of the improvements. The rental valuation of $100,000 was for the use of the land as a site for the wastewater treatment facility. It was the amount the state required to be paid by the city *for that use.* Under no stretch of the imagination could the appellants use the land for that purpose under their restricted grazing lease. After the institutional taking, the appellants were entitled to be paid reasonable compensation for damages sustained by the cancellation of *their lease.* A.R.S. § 37–442(B).

Arguing that they are also entitled to the rental value of the improvements, the appellants first postulate that the sewer plant is a fixture since it is permanently attached to the realty. Having been placed on the land by the trespassing city, they next contend the state, as the owner of the land, became the owner of the improvements. Assuming, arguendo, these predicates are correct, that does not entitle the appellants to lease the facility or to operate it. We must repeat, they are owners of a grazing lease and nothing more.

■ The appellants suggest another theory to substantiate this damage claim, that, as the possessor of the land, they are entitled to the mesne profits realized by the trespasser from its use of the land. The term "mesne profits" means "intermediate profits": that is, profits which have been accruing between two given periods. *Dumas v. Ropp*, 98 Idaho 61, 558 P.2d 632

(1977). Mesne profits are most often defined as the value of the use or occupation of the land during the time it was held by one in wrongful possession and are commonly measured in terms of rents and profits. *Dumas v. Ropp*, supra. Mesne profits often result from the trespasser's removal of products of the land, i.e., minerals, timber, etc. See, for example, *United States v. Marin Rock and Asphalt Co.*, 296 F.Supp. 1213 (C.D.Cal., 1969); *Dumas v. Ropp*, supra; *Miller v. Simon*, 100 Ill. App.2d 6, 241 N.E.2d 697 (1968); and *Joyce v. Zachary*, supra. However, mesne profits may also be recovered for the rental value, or rent realized, from improvements placed on the land. See *Krejci v. Capriotti*, 16 Ill.App.3d 245, 305 N.E.2d 667 (1973); *Dupuy Storage and Forwarding Corp. v. Cowan*, 216 So.2d 610 (La.1968); *Falejczyk v. Meo*, 31 Ill.App.2d 372, 176 N.E.2d 10 (1961). All but one of the cited cases involve the recovery of the mesne profits by the owners of the land. *Joyce v. Zachary*, supra, however, affirmed a judgment for mesne profits in favor of leaseholders and against innocent trespassers. *Joyce* involved, however, the removal of oil from the leased premises. It did not involve profits from the construction of an improvement on the property. Unlike the instant case, however, the lease permitted the very activity conducted by the trespasser, the removal of oil.

■ Assuming, arguendo, that the appellants might have been entitled to mesne profits resulting from the improvement placed on the leased premises under a less restrictive lease, we do not believe they are entitled to such profits here. We repeat again that the appellants' right to use the land was limited to grazing. To permit them, under the guise of mesne profits, to recover the rental value of improvements they were not entitled to place on the land would result in a windfall to which they are not entitled. The water treatment facility was constructed on land the owner (the state) had sold to the city for that very purpose. Unlike the owners in the cited cases, the state could not have complained of the city's use of the section. Instead they were required by A.R.S. § 37–249 and *City of Sierra Vista v. Babbitt*, supra, to reimburse the city for the value of the improvement.

Affirmed in part and reversed and remanded in part with directions.

HOWARD and FERNANDEZ, JJ., concur.