810 P.2d 572

**Richard NEAL, Plaintiff–Appellee, Cross Appellant,**

v.

**CITY OF KINGMAN, an Arizona political subdivision; Board of Adjustment of the City of Kingman, Arizona, an administrative body, Defendants–Appellants, Cross Appellees.**

No. 1 CA–CV 88–268.

Court of Appeals of Arizona, Division 1, Department B.

Oct. 30, 1990.

Review Granted May 7, 1991.*

---

\* Gordon, C.J., of the Supreme Court, recused himself and did not participate in the determination of this matter.

Dushoff & McCall by Dale S. Zeitlin, Phoenix, for plaintiff-appellee, cross appellant.

James E. Chavez, Kingman City Atty., Kingman, for defendants-appellants, cross appellees.

## OPINION

KLEINSCHMIDT, Judge.

This is an appeal from an order of the trial court setting aside a decision of the Kingman City Board of Adjustment requiring the reconstruction of an advertising sign so that it will be more visible from Highway 66 than from Interstate 40. We hold that no reconstruction is required, and we affirm the trial court.

## FACTS

Richard Neal owns a parcel of real property in the City of Kingman located close to both Highway 66 and Interstate 40, near where those roads intersect at an angle of approximately 50 degrees. In early 1986, Neal applied for a building permit to place an off-premise sign on the property fronting Interstate 40. The plat, Exhibit M in evidence, illustrates the relationship of the roads to the sign as it was constructed. The location of the sign in controversy is positioned on the plat at "Site No. 2." [See Appendix.]

According to the Kingman ordinance an off-premise sign along Highway 66 or Interstate 40 within the city limits must be within a 200–foot sign corridor immediately adjacent to those roads. City of Kingman, Ariz., Zoning Ordinance No. 135, section XXV, Off–Premise Signs, § 6.

At that time the ordinance read:

Off-premise signs must be *oriented* toward the street frontage of the zone in which it (sic) is located.

City of Kingman, Ariz., Zoning Ordinance No. 135, section XXV, Off–Premise Signs, § 5 (emphasis added).

The city's zoning administrator, Thomas Duranceau, refused to issue the requested building permit, advising Neal by letter that the sign did not qualify as an Interstate 40 sign. The letter added:

An off premise sign must be oriented to the road being claimed. This means the sign should be *perpendicular* to the road being claimed as a highway corridor. (Emphasis added).

Because Neal's property abutted Highway 66, that was the only road that could serve as a highway corridor for his sign.

Neal met with Duranceau to discuss the matter, and as a result of that meeting, a building permit was prepared for Neal's signature. Before the permit was issued, Neal was asked to sign a list of conditions which were referred to in the permit and attached to it. One of these conditions stated that the sign: "[m]ust be oriented to Arizona 66, meaning faces perpendicular to Arizona 66 r/w line. Cannot orient sign to I–40."

Neal promptly spoke with Dennis Roberts, Duranceau's immediate supervisor, and explained that he would not sign the permit or the list of conditions because the ordinance did not require signs to be perpendicular to the roadway. Roberts then

wrote on the list of conditions: "Sign will comply with the requirements of Sign Code, Dennis Roberts 5/12/86." Neal then signed and paid for the permit.

Neal constructed his sign at a cost of approximately $30,000. As the sign was being built the city conducted regular inspections of the construction but never advised Neal that there were any problems with its orientation. The day after the sign was completed, Duranceau "red-tagged" it, prohibiting its use because it was oriented to Interstate 40 rather than to Highway 66. The evidence indisputably shows that while it is possible for motorists driving in a northwesterly direction on Highway 66 to read the sign, it is very difficult for motorists driving in the opposite direction on that road to see it. The sign is easily readable by motorists traveling in both directions on Interstate 40.

Neal appealed Duranceau's interpretation of the ordinance to the City of Kingman Board of Adjustment, arguing that the sign was oriented to Highway 66 and that the ordinance did not require that it be perpendicular to that highway. At the hearing, Duranceau stated that "orient" meant that the sign should be situated so that it could be read from both directions on the highway for which it was permitted. It was his opinion that Neal's sign was placed primarily for traffic on Interstate 40 rather than for traffic on Highway 66, the highway for which the sign was permitted. The board agreed, and unanimously voted to uphold Duranceau's decision to "red-tag" the sign, finding that it was not properly oriented to Highway 66 because it was more readable from Interstate 40 than it was from the access road of Highway 66.

Neal filed a special action in the superior court claiming that the board had abused its discretion, that he had acquired a vested interest in the sign, and that the board had unconstitutionally discriminated against him. Both parties filed for Partial Summary Judgment. The court held that Neal's complaint set forth three separate claims. It ruled that the board had not abused its discretion in finding that the sign did not conform to the ordinance. It found that

Neal was entitled to a trial on his vested right claim which had never been considered by the board. Neal did not pursue his discrimination claim and it was dismissed.

The trial court, sitting with an advisory jury, ruled that Neal had a vested right in the sign as it is presently constructed. The city appealed this decision and Neal cross-appealed, challenging the validity of the ordinance and the power of the board to enforce it as it did. We resolve the following questions.

1. Is the sign ordinance unconstitutionally vague?
2. Did the board of adjustment abuse its discretion in the way it interpreted the ordinance?
3. Did Neal waive his right to assert that he had a vested right in the sign as constructed?
4. Did the trial court err in conducting a trial to determine whether Neal had acquired a vested right in the sign?
5. Did the trial court err in finding that Neal had acquired a vested right in the sign?

We find that the ordinance is not unconstitutionally vague, that the board did not abuse its discretion in how it interpreted the ordinance, that Neal did not waive his right to assert that he had acquired a vested right in the sign, that the trial court did not err in conducting a trial on the vested right issue, and that the evidence supports Neal's right in the sign under principles of equitable estoppel rather than vested rights.

## CONSTITUTIONALITY AND CONSTRUCTION OF THE ORDINANCE

■ Neal argues that the Kingman sign ordinance is unconstitutionally vague and ambiguous and is therefore void. Although it is questionable as to whether the constitutionality issue was adequately raised before the board, we will address the matter on the merits because the meaning of the ordinance was thoroughly considered in that proceeding. We note that for purposes of resolving the vested right

issue, the trial court ruled, as a matter of law, that the ordinance was ambiguous. We agree that the ordinance could have been more clear, and this lack of clarity contributed to the problem that arose as to how the sign could be situated. We do not believe that the ordinance was so ambiguous as to be unconstitutional. Because statutory interpretation is an issue of law, we may freely draw our own legal conclusions on this point. *U.S. Parking Systems v. City of Phoenix*, 160 Ariz. 210, 772 P.2d 33 (App.1989).

The ordinance in question provides that off-premise signs must be *oriented* toward the street frontage of the zone in which the sign is located. City of Kingman, Ariz., Zoning Ordinance No. 135, section XXV, Off–Premise Signs, § 5 (emphasis added). Neal contends that the word "oriented" is vague in the context used, and as proof of his position he points out that soon after the problem with his sign arose, the city amended the ordinance by substituting the word "perpendicular" for "oriented." He relies on *Cohen v. State*, 121 Ariz. 6, 588 P.2d 299 (1978) for the proposition that when a statute is so vague that men of common intelligence must guess at its meaning and may differ as to how it should be applied, the application of the statute may constitute a denial of due process.

■ The rules that govern the construction of statutes are to be applied to the interpretation of ordinances. *Arizona Found. for Neurology & Psychiatry v. Sienerth*, 13 Ariz.App. 472, 475, 477 P.2d 758, 761 (1970). A court must consider the natural meaning of words in the context of the entire ordinance such that all parts are given their intended effect and the ordinance is construed as a harmonious whole. *Sandblom v. Corbin*, 125 Ariz. 178, 182–83, 608 P.2d 317, 321–22 (App.1980).

We do not believe that the word "orient" is particularly unclear as used in the ordinance. Off-premise signs like the one in question here are designed to attract the attention of motorists. The limitations set out in the Kingman ordinance as to size, location, and orientation are designed to permit signs and at the same time provide that travel on the city streets and highways be safe and efficient. City of Kingman, Ariz., Zoning Ordinance No. 135, section XXV, Purpose and Intent. As one of the board members observed, this allows for road signs that will attract the attention of the traveling public on a particular road without unduly distracting motorists on nearby streets and highways. To serve this purpose, it is reasonable to require that a sign face a particular roadway. While we do not think that "orient" means "perpendicular," and while the term could conceivably be extremely vague in some other context involving the placement of signs, we have no trouble understanding its meaning as it should have been applied to the facts of this case. Webster's New World Dictionary, Second College Edition (1982), defines "orient" as "to adjust or adapt to a particular situation." To orient a sign to a particular road is to make it readable from that road. It is undisputed that the sign in question is more easily readable from Interstate 40 than it is from Highway 66. It is also true that readability from Highway 66 was sacrificed to make the sign easily readable by people traveling in either direction on the Interstate. It is plain to us that it is "oriented" to Interstate 40 and not to Highway 66.

This is not to deny that from the beginning, and as the events of this case developed, considerable confusion about the meaning of the ordinance arose. Before Neal was issued the permit, there was some question as to what was required by the sign ordinance. Duranceau, upon rejecting Neal's first application for the permit, indicated that the ordinance required any sign erected to be perpendicular to the highway for which the sign was permitted. Neal questioned this interpretation and requested a hearing before the board of adjustment. Duranceau suggested that Neal take the matter to the Planning Department. Neal then met with Duranceau and discussed the proposed location of the sign, after which Duranceau agreed to issue the permit. Later, when Neal picked up the permit he told Roberts that he would not sign the list of conditions because the ordinance did not require perpendicularity.

This sequence of events indicates that, as between these parties, there was some confusion or dispute about the meaning of the ordinance. This, however, does not affect our previous holding that the statute is not unconstitutionally vague.

Neal also argues that the board of adjustment's action in upholding the zoning administrator's decision violated A.R.S. section 9–462.06(H)(1), which prohibits a board from changing the terms of a zoning ordinance. He claims that the board ruled that his off-premise sign must be "perpendicular," rather than "oriented," to Highway 66, thus changing the terms of the zoning ordinance. We find nothing in the record of the board of adjustment hearing to support this argument. To the contrary, the board members refused to determine that the ordinance required the sign to be perpendicular to Highway 66. They merely voted to uphold the determination of the zoning administrator that Neal's sign was not properly oriented to Highway 66 because the sign was more readable from Interstate 40 rather than Highway 66.

## THE VESTED RIGHT CLAIM WAS NOT WAIVED

■ A vested right arises where a permit has been legitimately issued and the permittee has substantially relied upon the permit and incurred considerable expense, *Town of Paradise Valley v. Gulf Leisure Corp.*, 27 Ariz.App. 600, 608, 557 P.2d 532, 540 (1976), or the permittee in good faith has commenced construction, *Phoenix City Council v. Canyon Ford, Inc.*, 12 Ariz. App. 595, 600, 473 P.2d 797, 802 (1970). The city claims that Neal waived his vested right claim by not presenting it to the board and thus should not have been allowed to raise it for the first time in his petition for special action. The trial court, in the erroneous belief that the city had not raised waiver of this particular claim, declined to rule on it. Contrary to Neal's assertions on appeal that the city failed to assert his supposed waiver, the record shows that the city, in its Answer and its Response to Neal's Motion for Partial Summary Judgment, Cross Motion for Partial Summary Judgment, argued that Neal could not raise the vested right issue in the special action because that issue had not been presented to the board of adjustment.

■ The question then is did Neal, in fact, waive his vested right claim? The city contends that Neal had a full opportunity to present his case to the board of adjustment and never raised his claim of a vested right. Generally, failure to raise an issue before an administrative tribunal, such as a municipal board of review, constitutes waiver, unless the issue is jurisdictional in nature. *See, e.g., Rouse v. Scottsdale Unified School Dist.*, 156 Ariz. 369, 371, 752 P.2d 22, 24 (App.1987).

The record of the hearing before the board shows that Neal attempted to present the claim that he had a vested right in the sign but was prevented from doing so. When Neal attempted to discuss the alleged lack of cooperation and supposed harassment by the zoning administrator, he was told in no uncertain terms by a member of the board that the question before the board was specifically the interpretation of the sign ordinance and that the board would "hold this meeting to this issue." Soon thereafter, Neal attempted to point out that he had been harassed and that the zoning administrator's interpretation of the ordinance had cost him over $71,000. At that point the board member told him "whether [he had] been harassed or what the cost [had been] ... is not the issue before this Board." Neal then responded, "I withdraw, I withdraw the whole problem here." Had that been all that transpired, the city's argument would be stronger. But there is more. Toward the end of the hearing, Neal again tried to assert his position when he stated:

The issue is, I have a tremendous amount of money in here for following your ordinances, the City's ordinances, ... there has been tremendous aggravation on the second sign ... [Duranceau] could have talked me into having me move that sign and install it perpendicular. He could have then come back to me and said hey, you were right, it is exactly perpendicular I was not within

those ordinances.... I am sure that you are not worried about the expense on my behalf, but to date that sign has been delayed, that it has been ten months getting this far with this sign. It has cost me over $71,500 in lost revenues on that sign. It is extremely difficult to try and continue on, because I feel that they have spent more time playing games with me instead of sitting down and trying to work something out.

Without a direct response, the board took a vote and upheld the decision of the zoning administrator.

There was no claim that the permit had not been legitimately issued. Although Neal's effort to assert his vested right claim might have been inartful, it was sufficient to raise the issue. Neal was foreclosed from presenting argument and/or evidence that he relied on the permit and what he believed to be the city's interpretation of it, and was foreclosed from arguing that he had incurred substantial expense in reliance on the permit and had acted in good faith in constructing the sign. These are questions the board could have—but did not—address.

### TRIAL OF THE VESTED RIGHT ISSUE

The next issue the city argues is that the trial court erred in holding what both parties have called a trial *de novo* on Neal's claim that he had acquired a vested right in the sign as it was constructed. The trial court concluded that the vested right claim could be segregated from the other issues raised in the special action and that it could be resolved in a trial. The city argues that under A.R.S. section 9–462.06(J) [1] a trial *de novo* is not available from a decision of the board of adjustment; a proper review is limited to the record or, if incomplete, the remedy is to remand the issue to the board. In response, Neal urges that his claim of vested right is an independent cause of action which is not subject to the statutory special action procedure. The term "trial

*de novo,*" as it is used in connection with this case, is a misnomer because the trial court did not relitigate facts which had been presented to the board. The trial court never termed the proceeding on this point a "trial *de novo.*"

The first question pertaining to this issue is whether the board has the authority to consider a vested right claim. If it has the authority to—and if it does consider such a claim—we believe that under the holding in *Book Cellar, Inc. v. City of Phoenix,* 139 Ariz. 332, 678 P.2d 517 (App. 1983), the trial court could review the board's ruling by special action but would be limited to deciding the question whether the board abused its discretion. That question could only be decided on the record established before the board. *See* A.R.S. § 9–462.06(G).

We think the board had authority to consider the claim of vested right. A municipal board of adjustment has limited powers and acts in a quasi-judicial capacity. *Arkules v. Board of Adjustment of Paradise Valley,* 151 Ariz. 438, 440, 728 P.2d 657, 659 (App.1986). These powers, either expressed or implied, are conferred by statute. *Cracchiolo v. State,* 146 Ariz. 452, 457, 706 P.2d 1219, 1224 (App.1985). The board's authority is derived from A.R.S. section 9–462.06(G) which provides in part that a board of adjustment shall:

1. Hear and decide appeals in which it is alleged there is an error in an order, requirement or decision made by the zoning administrator in the enforcement of a zoning ordinance adopted pursuant to this article.

\* \* \* \* \* \*

3. Reverse or affirm, wholly or partly, or modify the order, requirement or decision of the zoning administrator appealed from, and make such order, requirement, decision or determination as necessary.

We see no reason why the board would not have the authority, implied through the powers conferred by statute, to determine

---

1. This statute was amended in 1988, inserting a new subsection "J" and redesignating the former subsection "J" as subsection "K." Laws 1988, ch. 269, § 1. Throughout this decision we will refer to it as subsection "J."

whether a permittee has acquired a vested right in a particular improvement.

■ The next question concerns the effect of the board's refusal to consider the vested right issue. Neal, in the trial court, can hardly be restricted to a review of the board's action when the board wholly refused to consider the point. The board, in essence, declined to determine the vested right claim and cannot complain if Neal sought relief elsewhere. Although the issue became enmeshed in a procedural snarl, the trial court's decision to try the vested right issue was appropriate.

## VESTED RIGHT ESTOPPEL—SUFFICIENCY OF EVIDENCE

The city further argues that the trial court misinterpreted the law and erred in finding Neal had a vested right in the sign as constructed. A vested right arises where a permit has been legitimately issued and the permittee has substantially relied thereupon and incurred considerable expenses. *Town of Paradise Valley v. Gulf Leisure Corp.*, 27 Ariz.App. 600, 608, 557 P.2d 532, 540 (1976). This rule of law has been applied in situations where a governing body, after a change in the zoning law, attempts to prevent the construction authorized under a previously issued and valid permit. *Id.* Arizona courts have refused to find a vested right where no permit has been issued, or where a permit has been issued but there has been minor work performed prior to the legislative change. *City of Tucson v. Arizona Mortuary*, 34 Ariz. 495, 272 P. 923 (1928); *Verner v. Redman*, 77 Ariz. 310, 271 P.2d 468 (1954); *Phoenix City Council v. Canyon Ford, Inc.*, 12 Ariz.App. 595, 473 P.2d 797 (1970); *Burroughs v. Town of Paradise Valley*, 150 Ariz. 570, 724 P.2d 1239 (App.1986).

The city attempts to argue, for the first time on appeal, that the permit was not legitimately issued because Dennis Roberts, the immediate supervisor of Duranceau, made unauthorized changes in the permit so that it read that Neal need only comply with the sign code. This argument lacks serious merit since Roberts added nothing to the permit which was contrary to the ordinance, but merely stated that the sign must comply with the sign ordinance.

■ Because this case involves the interpretation of a permit, rather than the revocation of a permit pursuant to a change of law, it does not fit neatly with existing cases which discuss vested rights. It does not matter, however, what Neal calls his claim if both parties tried the case and submitted it for decision on a theory of law that fits the circumstances. The doctrine of estoppel underpins the claim of vested right. *Gulf Leisure Corp.*, 27 Ariz.App. at 608, 557 P.2d at 540. Here, there was considerable confusion manifested by both parties as to what theory Neal was proceeding under. The trial judge took a strong hand in drafting instructions to the jury which were in accord with both the law and the evidence presented. The matter was presented to the jury on a combined theory of vested rights and equitable estoppel.

The four elements necessary to establish an estoppel defense are:

1. The party to be estopped must know the facts;

2. [H]e must intend that his conduct shall be acted upon or must so act that the party asserting the estoppel has a right to believe it is so intended;

3. [T]he latter must be ignorant of the true facts; and

4. [H]e must rely on the former's conduct to his injury.

*Freightways, Inc. v. Arizona Corp. Comm'n*, 129 Ariz. 245, 247, 630 P.2d 541, 543 (1981) (citing *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104, 84 A.L.R.2d 454, 461 (9th Cir.), *cert. denied*, 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960)).

Neal testified that when his permit for the sign was refused, he requested a hearing before the board of adjustment for an interpretation of the ordinance requiring orientation. However, his request was denied by Duranceau, who later met with Neal, reviewed his plans submitted for the sign, and told Neal he would approve the

permit. Evidence was presented to the trial court which indicated that Neal proceeded with the construction of the sign, as it is currently situated, based not only on the permit but on the assurances of city inspectors that his sign would comply with the ordinance. Neal testified,

> I asked them [state and city building inspectors] very point blank if there was anything improper or any reason why we shouldn't be able to pour this [the concrete].... I said ... [i]s it proper to go ahead and start construction of this site? And they said yes, you have our word, everything complies, you can go ahead, start pouring concrete.

It is true that Thomas Duranceau testified that it is not possible to tell the direction the sign will face until the superstructure is erected, and he said that he red-tagged it as soon as he saw that the superstructure faced the wrong way. While the evidence is sketchy on the issue, Neal attempted to contradict this evidence by saying that the holes are pre-drilled so that the direction the sign will face is determined by how the pole is installed.

Finally, Duranceau was aware of the fact that Neal had refused to sign the list of conditions, one of which stated the sign had to be perpendicular to Highway 66, and still allowed Neal to construct his sign. In any event, the judge and the jury were not compelled to accept Duranceau's version of when he learned how the sign would face.

The trial court, relying heavily on the advisory jury's special findings, concluded:

> 4. The engineering plans and specifications for the billboard were approved by the City of Kingman. The City of Kingman inspectors inspected the billboard, location of the billboard and the pole for the billboard prior to the billboard's installation.
>
> \*   \*   \*   \*   \*   \*
>
> 6. The billboard is installed in approximately one hundred tons of concrete, rises seventy feet in the air, and was built at substantial expense to Neal.
>
> 7. Agents and representatives of the City of Kingman made representations to Neal from which Neal reasonably con-

cluded that the permit allowed him to build a billboard that was not perpendicular to Highway 66.

> 8. It would be a serious injustice to require the plaintiff Neal to change or remove the billboard face so it is perpendicular to Highway 66.
>
> 9. The public interest would not be unduly damaged if the billboard is permitted to remain in its present configuration.

Given the disagreement and confusion that accompanied the issuance of the permit and the conflict in the evidence about the knowledge which the city had of how the sign was being constructed, we are satisfied that there was sufficient evidence to support the findings of the trial court. If the evidence does not compel the conclusion that Neal acted in good faith, it permits that conclusion. We will not disturb the findings unless there is nothing in the record to support them. *Whittemore v. Amator*, 148 Ariz. 173, 713 P.2d 1231 (1986).

## ESTOPPEL OF A GOVERNMENTAL AGENCY

We now turn to a consideration of the city's claim that the doctrine of estoppel cannot be applied against a governmental agency. The city raised this defense for the first time after the advisory jury had returned with its decision. Arguably, the city waived the point, but we choose to address it on the merits.

■ Generally, equitable estoppel does not apply to the state or its agencies or subdivisions in matters affecting governmental or sovereign immunity. *See Mohave County v. Mohave–Kingman Estates, Inc.*, 120 Ariz. 417, 421, 586 P.2d 978, 982 (1978). This is especially true if the claim of estoppel is based upon an *ultra vires* or illegal act of a government official. *School Dist. No. 69 v. Altherr*, 10 Ariz. App. 333, 458 P.2d 537 (1969).

The rule is by no means absolute. Our supreme court has held that when justice dictates and the public interest will not be unduly damaged, estoppel will apply

against the state where its application will not affect the exercise of governmental powers or sovereignty, or make binding the unauthorized acts of government officers or employees. *Freightways,* 129 Ariz. at 248, 630 P.2d at 544. In *Freightways,* the court held that the corporation commission could not invalidate a transportation certificate that had been in use for a long period of time even though, years before, the holder of the certificate had not complied with the rules relating to renewal. The court was concerned with the long period of time the certificate had been in use, but it was also concerned with the fact that the commission had failed to take any action to revoke the certificate and that Freightways, which had recently purchased it, had relied on its validity.

Courts in other jurisdictions have had no trouble applying equitable estoppel against governmental entities in zoning cases. *Jones v. City of Aurora,* 772 P.2d 645, 647 (Colo.App.1988) (court may apply the doctrine when necessary to prevent manifest injustice); *Charleston County v. National Advertising Co.,* 292 S.C. 416, 417–18, 357 S.E.2d 9, 10 (1987) (plaintiff spent a substantial sum of money erecting a billboard after relying on advice from county official acting within proper scope of authority); *Municipality of Anchorage v. Schneider,* 685 P.2d 94, 97 (Alaska 1984) (denying the use of estoppel against a municipality causes arbitrary and unjust results when the elements of estoppel are present and the public will not be significantly prejudiced); *Town of Boulder v. Bullock,* 632 P.2d 716, 722 (Mont.1981) (plaintiff was misled to his disadvantage by relying on representations of city officials).

Other courts have recognized that the doctrine of equitable estoppel can apply against governmental entities in zoning cases but chose not to estop the town or city under the situations before them. *Bridge v. Zoning Bd. of Adjustment,* 233 N.J.Super. 587, 597, 559 A.2d 855, 860 (App.1989) (remanded for a finding as to whether estoppel should apply); *Robert L. Rieke Bldg. Co. v. City of Olathe,* 10 Kan. App.2d 239, 246–48, 697 P.2d 72, 79 (1985); *Zoning Comm'n of Town of Sherman v.*

*Lescynski,* 188 Conn. 724, 453 A.2d 1144 (1982).

In other types of cases, courts have permitted estoppel against the government to prevent a manifest injustice when the exercise of governmental powers would not be impaired by the application of the doctrine. *Shafer v. State,* 83 Wash.2d 618, 521 P.2d 736 (1974); *West v. Department of Social & Health Servs.,* 21 Wash.App. 577, 586 P.2d 516 (1978); *Land-of-Sky Regional Council v. Henderson County,* 78 N.C. App. 85, 336 S.E.2d 653 (1985); *W.V. Pangborne & Co. v. New Jersey Dep't of Transp.,* 116 N.J. 543, 562 A.2d 222 (1989). Several cases, zoning and other, recognize that the government can be estopped by its silence if it knows that another is relying to his detriment on such silence. *Rieke,* 10 Kan.App.2d at 247, 697 P.2d at 79; *Bullock,* 632 P.2d at 720; *Board of Regents of the Univ. of Wash. v. City of Seattle,* 108 Wash.2d 545, 741 P.2d 11 (1987).

All of the elements necessary to the invocation of estoppel are present here, or at least a trier of fact could so find. Neither side contends that any action of the city zoning officials was *ultra vires* or illegal so we need not dwell on that aspect of the *Freightways* test. That leaves the question of whether application of the doctrine of estoppel will affect the exercise of governmental power or sovereignty. The evidence shows that several signs existing at the time Neal erected his sign were not perpendicular to the roadways and may not have even satisfied the orientation requirement. We assume that this sign does not stick out like a sore thumb. We simply do not believe that the existence of this single sign has much adverse impact on the exercise of governmental power or sovereignty.

The strongest support for a contrary view is found in *National Advertising Co. v. Arizona Department of Transportation,* 126 Ariz. 542, 617 P.2d 50 (App.1980). In that case, a billboard had been erected along Interstate 10 in Phoenix pursuant to a temporary permit that allowed for its construction at a point 2,000 feet west of 40th Street. By mistake, the sign was built only 1,300 feet west of 40th Street.

The sign was in place for five years and during that time had been sold to the appellant. Thereafter, the department of transportation discovered the mistake and ordered the sign's removal. Since the appeal was from the action of an administrative body, the court was limited to the question of whether the administrative action was illegal, arbitrary, capricious, or involved an abuse of discretion.

The owner of the billboard contended that the department was estopped to order the removal. This court disagreed. We stated that the department was under no duty to complete field studies within time to have notified the appellant of the violation, that given the magnitude of the department's task, the delay in discovering the mistake could not be said to be unreasonable, that before the appellant purchased the sign he could have checked to see that it was properly located, and that the temporary nature of the permit should have alerted the appellant to the tenuous nature of the rights he was purchasing.

There are several distinctions between the case before us and *National Advertising* that lead us to the conclusion that *National Advertising* does not control. The first is that the standard of review in the trial court is different in the two cases. The trial court here was not reviewing an administrative decision; it was trying the "vested interest" issue for the first time. Thus, it was free to make its own decision based on the facts before it. The court in *National Advertising* was required to uphold the administrative ruling against the sign unless it was arbitrary, capricious, or amounted to an abuse of discretion.

The second reason that *National Advertising* should not control is that here Neal's construction of the sign was the subject of some dispute from the beginning and the construction took place under the eyes of city officials without any attempt to correct Neal's interpretation of the permit until it was too late. The case, as the judge decided it, simply did not involve a mistake of which the city was unaware.

The judgment of the trial court is affirmed.

JACOBSON, J., concurs.

APPENDIX

Interstate Highway 40

NOTES:
1. Drawing No. D-8-T-299, Sheet No.6 of 16 of the Arizona Department Of Transportation Project No. I-40-1(32)53 was used as basis of Bearings for this survey.
2. The symbol ● indicates A.D.O.T. concrete monument with aluminum disc.
3. Situate in Section 8, T21N, R16W, G.& S.R.M., Mohave County, Arizona.
4. Calc. means calculated.
5. Meas. means measured.

This Plat represents a survey made by me or under my direction for the purpose of determining an angular relationship of two outdoor advertising signs to the Right-of-Way lines of U.S. Highway 66 and Interstate Highway 40 as indicated hereon, this ___ day of ___, 1987.

Ralph Byron Sutton, R.L.S. 15341

VOSS, Presiding Judge, dissenting.

In affirming the trial court, the majority finds a vested right where one cannot exist, and reaches for a remedy, equitable estoppel, which was never pled or tried at the administrative or trial court level. I dissent.

## BACKGROUND

Neal owned a McDonalds restaurant in Kingman, Arizona. As a businessman who knew the value of advertising, Neal applied for a sign permit to construct a billboard advertising his business. Neal knew that the traffic flow on I–40 was much greater than that on Highway 66 and his intent from the beginning, as shown by his acts and testimony, was to construct a sign that would orient to the highest number of customers, those traveling on I–40. A problem arose, however, when the city advised Neal that the location for his sign was within the 200 foot "sign corridor" for Highway 66. This corridor involves the 200 feet on either side of a roadway, measured from the centerline. Signs erected in the "sign corridor" of a particular highway must, by ordinance, be "oriented" to that highway. In Neal's case this meant that he could only obtain a permit to erect a sign that would orient to Highway 66, rather than the busier road, I–40. The advice of city officials and the clear requirements of the ordinance that the sign orient to the roadway for which the permit was issued notwithstanding, Neal erected a sign, the proximity and orientation of which are best illustrated by the diagram admitted into evidence that was prepared by a Registered Land Surveyor. The diagram, which appears in the text of the majority opinion, illustrates that Neal's sign (Site No. 2 on the diagram) is almost perpendicular, 84 degrees, to I–40 and only 33 degrees to Highway 66.

## ORIENTATION OF THE SIGN

The majority, in holding the sign ordinance constitutional, holds in part that the term "orient" is not vague or ambiguous. The majority concedes that the sign is more readable from I–40 than Highway 66 and thus, it is, "oriented to I–40 and not Highway 66." At the Board of Adjustment hearing, Neal described his approach to "orientation", "Ah, when I read that [sign code] it tells me that I have a lot of latitude and angle, orient gives me a lot of degrees and angles to set that sign. The sign is set to do the best job for the position that it is in." Neal continued, "I didn't put that sign up there to hide it. I put it up there to get the highest exposure rate that I could get, and the highest exposure rate has to do with all directions of traffic around me." The trial court, in its ruling on summary judgment stated:

> As to issue number two, the Court has reviewed the record of the meeting of the Board of Adjustments of August 7, 1986 and concludes that there is no disputed issue of fact. The board's determination that plaintiff's sign was not oriented to Highway 66 was not arbitrary, capricious or an abuse of discretion. There was ample evidence before the board to support their determination that city employees had made a proper determination.

> I cannot conceive how Neal could properly orient his sign to I–40 through a permit to build on and orient to Highway 66. City officials informed Neal on several occasions that if he received a permit for a Highway 66 sign, the sign was to be oriented to Highway 66 and not I–40. The permit specifically warned: "Cannot orient sign to I–40." The unique convergence of the two highways presented Neal with the opportunity to advertise on I–40, where traffic was much greater but a permit unavailable, through a permit for Highway 66. To take advantage of the opportunity Neal simply had to ignore the requirements of the ordinance and the prohibition on the permit and orient the sign to I–40, which he did.

## THE INSTRUCTIONS

The city also objected to the instructions given by the court. The court instructed the jury that the issue it was to decide was whether Neal had acquired a vested right to the sign. Both Neal and the city objected to the instruction which attempted to define vested right. It was apparently drafted by the trial court as it is not consistent with anything submitted by the parties. The instruction reads:

> Plaintiff maintains that he has acquired a vested right in the billboard as presently

constructed. A person may acquire a vested right if:

1. a building permit is issued;

2. the permittee acts in reasonable reliance upon the terms of the permit;

3. as a result of the reliance the permittee incurred considerable expense;

4. it would be a serious injustice if the permittee is now required to change or remove the structure; and

5. the public interest would not be unduly damaged if the structure is permitted to remain.

The instruction is erroneous. It confirms that Neal's claim is one of vested right but then goes on to state some elements of equitable estoppel. As the majority states, "The matter was presented to the jury on a combined theory of vested rights and equitable estoppel." The result is that the jury was incorrectly instructed and asked to decide a vested right claim based on an erroneous instruction.

## VESTED RIGHT AND EQUITABLE ESTOPPEL

This case is distinguishable from the Arizona cases that apply the vested right rule. The cases cited by the city demonstrate that the vested right rule only applies where there has been a *change* in an ordinance or law that affects a previously issued permit. In those cases the court permitted the parties to act under the permit, and the law in effect at the time it was issued, if there was some type of substantial reliance on the permit and the law it encompassed. *Gulf Leisure*, 27 Ariz.App. 600, 557 P.2d 532. However, if there was no permit, even though there may have been substantial reliance on old law, or if there was a permit but minimal reliance, the new law was controlling. *Arizona Mortuary*, 34 Ariz. 495, 272 P. 923; *Verner*, 77 Ariz. 310, 271 P.2d 468; *Canyon Ford*, 12 Ariz.App. 595, 473 P.2d 797; *Burroughs*, 150 Ariz. 570, 724 P.2d 1239. Here, there was no change in the law. The city simply is trying to enforce the sign ordinance in effect when Neal received his permit.

The majority's reach for an alternative theory belies its reliance on a vested right to affirm. The majority reaches equitable estoppel by stating, "It does not matter, however, what Neal calls his claim if *both* parties tried the case and submitted it for decision on a theory of law that fits the circumstances." (Emphasis added.) I am certain it comes as a surprise to both parties that this case was tried as an equitable estoppel case.

Equitable estoppel was not raised at the Board of Adjustment or trial court. The May 11, 1987, court order confirms that the only issue surviving the motion and cross motion for summary judgment was that of vested right. Only one issue was listed by the parties in the joint pretrial statement as a contested issue of law and fact, and that issue was: "Does Richard Neal have a vested right ... to the sign." During the hearing settling instructions, *Neal's* counsel stated, "The issue as I understand it before the jury and the Court at this point is one of vested rights...." Neal's counsel objected to the court's instruction as not properly reflecting the elements of vested right. Paragraphs 4 and 5 of the vested right instruction contain "serious injustice" and "public interest" language. Regarding this language, Neal's counsel stated, "They are not part of any proposed jury instructions and did not grow out of the evidence presented at trial...." The judgment signed by the trial court, which is the subject of this appeal, states one reason as the basis for its ruling: "Wherefore, the Court finds ... that the plaintiff has a vested right ... to the billboard...." Even the majority, in justifying the *de novo* aspect of the trial, states, "The trial court here was not reviewing an administrative decision; it was trying the 'vested interest' issue for the first time." The majority opines that the trial court was correct in trying the vested right issue *de novo* as Neal was prohibited from trying the issue before the board. No such argument can be made with respect to equitable estoppel. The trial court in a statutory special action to review action taken by a municipal board is limited to the record. *Robertson v. Superior Court*, 136 Ariz. 440, 666 P.2d 540

(App.1983). "[T]he Superior Court, in reviewing a decision of the Board of Adjustments, is limited to finding error and not to substitute its opinion of the facts for the Board's, and if the evidence supports the Board's decision it should be affirmed." *City of Phoenix v. Superior Court,* 110 Ariz. 155, 515 P.2d 1175 (1973). The words "equitable estoppel" do not appear anywhere in the record before the Board of Adjustment. The trial court clearly erred in drafting new pleadings for the parties, over their objections, after the close of evidence. It is a great understatement to say that the court here went beyond its jurisdiction.

### a. *Equitable estoppel does not apply.*

The majority concedes, equitable estoppel "generally ... does not apply to the state or its agencies or subdivisions...." However, a governmental entity may be estopped, "when necessary to prevent a manifest injustice, and the exercise of governmental powers will not thereby be impaired." *Shafer,* 83 Wash.2d at 620, 521 P.2d at 738. The general rule is that equitable estoppel is applied to municipal corporations with great caution and only in exceptional cases. *Bullock,* 632 P.2d at 720. The majority relies on *Freightways,* 129 Ariz. 245, 630 P.2d 541, to support its holding. *Freightways* is the only Arizona case cited by the majority in which the doctrine of equitable estoppel was applied.

In *Freightways,* the Arizona Corporation Commission issued a motor carrier certificate of public convenience and necessity to Louis Schade on June 4, *1924.* The certificate was renewed by the Commission and passed through many successive owners. On December 21, 1979, *fifty-five* years after the certificate was originally issued, Freightways, then the user/owner of the certificate, applied to the Commission to transfer the certificate to United Couriers, Inc. The Commission declined to honor the request stating that the certificate had expired on December 31, 1928, because of Schade's failure to comply with a November 30, 1928, general order of the Commission. Before this time neither Freightways nor any of its predecessors had any knowledge of any alleged defect in the certificate. Without addressing the requirements of the general order allegedly breached some fifty-five years before, the court concluded that it was incumbent upon the Commission to enforce its own orders, and it was the Commission which erred in issuing the annual renewal certificates. The court stated, "We believe that not only did the Commission know the facts, but expected the certificate to be used by Schade and his successors in interest and recognized by the public. The certificate holders and the public did exactly that for over fifty years." *Id.* at 247, 630 P.2d at 543.

While acknowledging that estoppel in the usual sense is not generally applicable against a sovereign, the court in *Freightways* was impressed with the temporal facts of the case.

> Admittedly, we base much of our decision on the long period of time that has elapsed between the defect in the issuance of the certificate and the attempt by the Commission to cancel it. How much time is necessary before a void certificate can ripen into a valid certificate we do not consider at this time. That will have to be determined on a case by case basis, but we have no hesitancy in saying that a *half century is sufficient.*

*Id.* at 248, 630 P.2d at 544. (Emphasis added.)

Here, the city did not have the type of knowledge possessed by the Commission in *Freightways.* Upon learning of the violation, the city acted in a timely manner to red tag the project. The majority attributes knowledge to the city which the record does not support: "Neal's construction of the sign was the subject of some dispute from the beginning and the construction took place under the eyes of city officials without any attempt to correct Neal's interpretation of the permit until it was too late. The case ... simply did not involve a mistake of which the city was unaware."

There was no mistake. That the requirements of the ordinance and sign permit

required the sign to be oriented to the highway for which it was issued—Highway 66—is undisputed. There was one inspection of the foundation, the hole in the ground, which was conducted contemporaneously by the City of Kingman building inspector and the state building inspector. Neal testified at trial that he asked the inspectors if he could go ahead and *start construction* and they said he could pour the concrete. Neal testified that the inspection represented his "only contact with any official." At that inspection, there were no violations that would allow red tagging. The majority incorrectly concludes from the record that the city was aware from this inspection that Neal would *thereafter* install the mounting pole and attach and orient the sign virtually perpendicular to I-40. The majority relies on Neal's assertion that the pre-drilled holes at the top of the mounting pole served as notice to the city of Neal's intent regarding orientation. The conclusion is untenable. The record does not indicate that the pole was even on the job site when the city made its foundation inspection. Even if it were, the location of the holes does not dictate the sign's orientation once the pole is placed in the concrete. Mr. Duranceau described what led to the ultimate red tagging of the project:

Q. Did you have any way of knowing prior to the sign faces actually being placed on the sign whether or not that sign was being constructed legally?

A. Well, since they build the sign from the bottom up starting with the foundation, you see the pole of the sign at both locations first, and basically you don't know which way the sign is going to be pointing until the superstructure itself goes up.

Q. Now, there is—let's cover a couple of things, but let's make sure this location was an okay location for the sign.

A. This location was legal in all respects.

Q. However, if I—I'm understanding correctly, it was a Highway 66 sign?

A. Yes. That's what I set out here, that it was in the corridor of Arizona 66, not the corridor of Interstate 40, and therefore it should be oriented to Arizona 66.

Q. Could Mr. Neal have put that sign in the corridor for I-40?

A. No, it didn't meet—there were already—all the locations were all taken for I-40 in that area.

Q. When was the next contact you had concerning this matter?

A. [A]bout the first week of July, that's when I saw that the superstructure had been put up for both signs ... and I saw that the superstructure for the sign nearest to the McDonald's had been put up and it appeared to me that the sign had been put up directed toward I-40 and not Arizona 66 as I had put on this particular sheet. At that time I then stopped the car, got out, went up to the sign because everything wasn't finished but you could see that the superstructure itself was going up and taped a red tag to the sign.

This testimony is undisputed in the record. Neal testified that he relied on the inspection. His reliance was justified because at that stage of the construction he had acted in accordance with the permit. As soon as Neal began installing the superstructure—the first point at which orientation of the sign could be determined—the city red tagged the sign. The facts here are not even remotely analogous to *Freightways.*

The majority also cites cases from other jurisdictions where the courts applied the doctrine of equitable estoppel against governmental entities in zoning cases.

*Schneider,* 685 P.2d at 97, is cited as a case where the doctrine was applied, "when the elements of estoppel are present and the public will not be significantly prejudiced." The doctrine was applied in *Schneider;* it was not, however, applied under facts remotely analogous to those here. In 1982, Schneider was sued by the municipality for maintaining two detached dwelling units on a parcel which was zoned for the construction of up to eight units, provided the units were incorporated into a single structure. The litigation was resolved through a settlement agreement.

The agreement resulted in the issuance of a permit that allowed Schneider to construct an additional three units to connect the two units. Schneider spent $24,000 in reliance on the permit. In 1983, the municipality discovered that prior to the settlement agreement and the issuance of the permit for the three units, the zoning on Schneider's property was changed restricting the total number of dwelling units to two. No one involved in the settlement knew of this change. The municipality then revoked the permit issued through the settlement agreement and Schneider filed a second suit.

The court, in applying equitable estoppel, emphasized the strong public policy of settling disputes and enforcing settlement agreements. "Failure to apply an estoppel theory in this case would only serve to re-open a lawsuit that both parties believed was settled." *Id.* at 98. *Schneider* was correctly decided because of the settlement agreement on which Schneider reasonably and foreseeably relied. The record here shows no comparable involvement by the city or justifiable reliance by Neal.

The majority also cites "other types" of cases, cases in which the courts permitted estoppel against a governmental entity to prevent a manifest injustice when the exercise of governmental powers would not be impaired by the application of the doctrine. *Shafer*, 83 Wash.2d 618, 521 P.2d 736; *West*, 21 Wash.App. 577, 586 P.2d 516; *Land-of-Sky Regional Council*, 336 S.E.2d 653 and *Board of Regents of the University of Washington*, 108 Wash.2d 545, 741 P.2d 11. I do not dispute that, in exceptional circumstances, equitable estoppel may be applied against a governmental entity. I merely contend that the facts here are not exceptional and the cases cited by the majority, because the holdings are based on exceptional circumstances or they are not zoning or building permit cases, are inapposite.

*Shafer* is a tort action that arose when a plaintiff tripped over a wrinkled rug in a liquor store. The case involved the statutory claim requirements for filing tort claims against the State. The court concluded that while normally estoppel is not allowed against the sovereign, in tort actions where the legislature has decided to treat the state as if it were a private citizen, estoppel may be applied.

*West* involved the responsibility of a mother to pay child support for her children after they had been placed in foster care. The court held that the department charged with administering the foster care program was estopped from charging West child support because it had not specifically advised her of her continuing support obligation.

*Land-of-Sky* is also not a zoning case. In 1971, the parties, and others, formed a regional planning and economic development commission. In 1984, after Henderson County withdrew from the commission, Land-of-Sky sought to recover contributions from Henderson County which represented Henderson County's proportional share of the costs of operating the commission. Henderson County defended by alleging that there never had been a joint resolution of the members reflecting the method of determining each member's participation and contribution responsibility as required by law. The court applied equitable estoppel against Henderson County.

> Applying the equitable principals above, we conclude that defendant ratified its actions as a member of plaintiff. From 1971 through February 1982, defendant participated as a member in plaintiff's activities. Defendant attended meetings, workshops and received the benefits of plaintiff's plans and services. During this time defendant made full payments of its proportionate share of plaintiff's budget as set forth in plaintiff's Bylaws.

*Land-of-Sky*, 336 S.E.2d at 657.

Finally, in *Board of Regents of the Univ. of Wash.*, the State of Washington acquired title to certain property in downtown Seattle in 1861. Thereafter, the University of Washington, through its Board of Regents, managed the property for the benefit of the University. In 1906, the City of Seattle condemned certain easements on the subject property for street purposes. No one appeared and a default judgment was tak-

en. The city asserted certain rights against Washington through the title taken in the condemnation action, including payment of street use fees and regulation of a pedestrian sky bridge which had been constructed over one of the roadways. Washington brought an action challenging the city's actions. One assertion, by Washington, was that the original condemnation action, in 1906, did not establish title of the subject property in the city and therefore the city's actions were without authority. Citing not only the condemnation action itself, but the numerous disputes, agreements, and years of silence by the parties regarding the subject property, the court held that Washington was estopped from disputing the 1906 condemnation.

The passage of time, thirteen years, fifty-five years and over seventy years, played a significant role in the decisions of the above courts to apply the doctrine of equitable estoppel. The involvement in the dispute of the entity against which the court granted equitable estoppel was substantial. These cases, in my opinion, are authority to deny equitable estoppel in this case, had it been properly presented below.

I also disagree with the majority's attempt to distinguish *National Advertising*, 126 Ariz. 542, 617 P.2d 50. Melvin Genser Outdoor Advertising, Inc., after obtaining a permit to erect a billboard, placed it incorrectly by a distance of more than a couple of football fields. Genser promptly sold the sign. When the new owner, National Advertising, was advised that the sign was in the wrong place and had to be moved, it argued that the Arizona Department of Transportation (ADOT) was estopped to order removal of the sign because they should have known initially that the sign was in the wrong place and five years had passed since its installation. National also argued that it was an innocent purchaser. The court disagreed with National's arguments. As to location, the court stated that ADOT had the right to assume that Genser would erect the sign at the site authorized by the permit. As to time, the court recited the clear law that the state cannot be estopped from pursuing statutory remedies available to it because of the

alleged dilatory conduct of its officers in acting to enforce a remedy. The court stated that the innocence of National was irrelevant; what is relevant is the state of mind of the entity constructing the sign, Genser. The court stated:

One of the elements of estoppel is that the party claiming to have been misled or deceived by the concealment of facts on which he relied must have been without knowledge of or the duty of inquiring further as to the real facts. (Citations omitted.) Before the sign was purchased, appellant could have checked to see if it was where it was supposed to be. The temporary nature of the permit should have alerted appellant to the tenuous nature of the rights he was purchasing.

*Id.* at 545–46, 617 P.2d at 53–54.

The facts of *National* go well beyond those of the instant case. *National*, like *Freightways*, articulates the law in Arizona of equitable estoppel as applied to a municipality. I believe the cases clearly show that equitable estoppel is to be applied sparingly and only in the clearest of factual circumstances. *National* and *Freightways* prohibit, not allow, the result reached by the majority.

## CONCLUSION

This case represents a major change in the type of facts necessary to raise the issue of equitable estoppel against a plaintiff government. Here, the issue of equitable estoppel was first raised during the settling of instructions. The judgment appealed from provides that vested right is the sole basis for the decision. This record notwithstanding, the majority relies heavily on equitable estoppel to support its decision. Such action clearly deviates from Arizona law, which requires that statutory special actions that contest action taken by a municipality, be limited to the record of the Administrative Board and whether the boards action is supported by the evidence.

Neal was the party with the information. He tried to obtain a permit to build a sign to advertise his business on I–40. He was

told he could not get a permit for I–40 and that the location where he wanted to put the sign was in the "sign corridor" for Highway 66. Undaunted, he acquired a permit to build on Highway 66. The ordinance that the majority upholds as constitutional requires that the sign be oriented to the roadway on which it is placed. The permit required that Neal orient the sign to Highway 66 and not to I–40. The city could not tell which direction Neal would orient the sign until he actually placed the superstructure on the supporting pole. Up to that time, all Neal's actions were in accordance with the permit. When Neal put the superstructure on the pole and, everyone agrees, oriented it to I–40, the inspector red tagged the structure. It is no wonder, with the results thus far obtained by Neal, that he has sold his McDonalds and gone into the sign business.

I would support the rulings of the Board and reverse the trial court's judgment that Neal had a vested right to the sign.